| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA | DOCKET NO. |
|---|---|
| v. | |
| ANGELA MARIA GOMEZ AGUILAR | MAGISTRATE'S CASE NO. 10 - 1944M |

FILED
CLERK, U.S. DISTRICT COURT
AUG 9 2010
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

Complaint for violation of Title 15, United States Code §§ 78-dd-2(a) (Foreign Corrupt Practices Act) and Title 18, United States Code § 2.

| NAME OF MAGISTRATE JUDGE | | LOCATION |
|---|---|---|
| HON. CHARLES F. EICK | UNITED STATES MAGISTRATE JUDGE | Los Angeles, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| February 15, 2007 | Los Angeles County | Unknown |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**SEE ATTACHMENT A**

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT FARRELL A. BINDER _Farrell a R____ |
|---|---|
| | OFFICIAL TITLE Special Agent - FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE |
|---|---|
| | August 9, 2010 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA:DMM   REC: DETENTION

## ATTACHMENT A

On or about the date set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ANGELA MARIA GOMEZ AGUILAR ("ANGELA AGUILAR"), an officer, employee, and agent of L.M., a domestic concern within the meaning of the Foreign Corrupt Practices Act ("FCPA"), willfully used, and aided, abetted, and caused others to use, means and instrumentalities of interstate and international commerce, corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and an offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentality thereof to affect and influence any acts and decisions of such government and instrumentality, in order to assist defendant ANGELA AGUILAR and others in obtaining and retaining business for and with, and directing business to L.M.'s manufacturing company located in Azusa, California, namely, contracts for the sale of equipment to the Mexican state-owned utility company Comision Federal de Electricidad ("CFE Mexico") as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------|------------------------------------------------------------------------|
| ONE | 2/14/07 | Wire transfer of $115,879.56 from L.M.'s Preferred Bank account to Grupo Internacional De Asesores S.A.'s Global Financial account. |

**A F F I D A V I T**

I, FARRELL A. BINDER, being duly sworn on oath, do hereby depose and say:

## I.

### INTRODUCTION

1.      I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have served in that capacity for more than twelve years.  I am currently assigned to the Los Angeles Office, White Collar Division, Public Corruption Squad. My main responsibility is the investigation of public corruption matters, including violations of the Foreign Corrupt Practices Act ("FCPA").  During my employment with the FBI, I have participated in investigations involving public corruption, bribery, fraud against the government, bank and loan fraud, wire fraud, mail fraud, social security fraud, and money laundering. Many of these investigations have involved the use of informants and cooperating witnesses, and have required financial analysis. I have also participated in the execution of numerous search and arrest warrants.  I have conducted physical surveillance and have monitored electronic surveillance.  In addition, I have attended numerous training sessions on the investigation of white collar crimes, including specialized training for FCPA investigations and international contract corruption.  The opinions I have formed and set forth in this affidavit are based on my experience

-1-

and training, as well as my consultation with other experienced investigators and agents of the FBI.

II.

**PURPOSE OF AFFIDAVIT**

2.      This affidavit is made in support of the issuance of a criminal complaint and arrest warrant for ANGELA MARIA GOMEZ AGUILAR (aka ANGELA MARIA GOMEZ DE AGUILAR, ANGELA MARIA CEPEDA GOMEZ AGUILAR, ANGELA GOMEZ CEPEDA), who is believed to have made corrupt payments to a senior official in the Mexican government, in violation of Title 15, United States Code, Sections 78dd-2, et seq. (Foreign Corrupt Practices Act).

3.      This affidavit is intended to establish probable cause for the requested criminal complaint and does not include all information known to me related to this investigation.  Where conversations are referred to herein, they are related in substance and in part, except where quotation marks are used. Where dollar figures and calculations are set forth herein, they are based on United States currency and approximate, unless expressly stated otherwise.

4.      The facts set forth in this affidavit are based upon my own personal observations, my training and experience, and information obtained during this investigation from other sources, including: (a) other law enforcement agents; (b) statements made or reported by various witnesses with personal knowledge of relevant facts; and (c) my review of records

-2-

obtained during the course of the investigation, as well as summaries and analyses of such documents and records that have been prepared by others.

## III.

### SUMMARY OF APPLICABLE FEDERAL STATUTES

5.      The anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), codified at Title 15, United States Code, Sections 78dd-1, <u>et seq.</u>, among other things, make it unlawful for any "domestic concern," or for any officer, director, employee, or agent of such domestic concern, to knowingly make use of any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any "foreign official," or while knowing that the money or thing of value will be offered, given, or promised, directly and indirectly, to any foreign official, for purposes of influencing any act or decision of such foreign official in his (or her) official capacity, in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person.  15 U.S.C. § 78dd-2(a) and (g).

6.      The definition of a "domestic concern" under the FCPA includes: (a) any individual who is a citizen, national, or resident of the United States; and (b) any corporation,

-3-

partnership, association, joint-stock company, business trust, unincorporated organization or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States. 15 U.S.C. § 78dd-2(h).

7.      The definition of a "foreign official" under the FCPA includes: any officer or employee of a foreign government or any department, agency or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization. 15 U.S.C. § 78dd-2(h).

## IV.

### PROBABLE CAUSE

A. BACKGROUND OF DEFENDANT

8.      ANGELA MARIA GOMEZ AGUILAR (aka ANGELA MARIA GOMEZ DE AGUILAR, ANGELA MARIA CEPEDA GOMEZ AGUILAR, ANGELA GOMEZ CEPEDA)(" ANGELA AGUILAR") is a Mexican citizen who resides in Cuernavaca, Mexico and is married to E.F.A.N. ("E.A."). As discussed below, ANGELA AGUILAR, with E.A., controlled several companies, including Sorvill International, S.A. ("Sorvill") and Grupo Internacional De Asesores S.A. ("Grupo"). She and E.A. maintained bank or brokerage accounts in the United States, Germany, Switzerland, and Mexico. E.A. purportedly served as a

-4-

consultant to L.M. ("L.M."), a privately-held manufacturing
company located in Azusa, California, and helped L.M. obtain
contracts from the Mexican state-owned utility company Comision
Federal de Electricidad ("CFE Mexico").  As discussed below,
evidence obtained by the government indicates that L.M. was
making bribe payments to a CFE Mexico foreign official named
N.M.D. ("N.M.") in exchange for being awarded contracts with CFE
Mexico and laundering the bribes through ANGELA AGUILAR's and
E.A.'s companies.

B. <u>OVERVIEW OF PROBABLE CAUSE</u>

        9.      The instant investigation arose out of a FCPA and
money laundering investigation conducted by the Department of
Justice ("DOJ"), the Securities and Exchange Commission ("SEC"),
and the Federal Bureau of Investigation's ("FBI") Houston Field
Office ("FBI-Houston").

        10.     On April 18, 2005, ABB Ltd, an energy equipment
and services company based in Switzerland ("ABB Switzerland") and
listed on the New York Stock Exchange, self-reported to the SEC
and the DOJ that its Sugarland, Texas subsidiary, ABB Inc., doing
business as ABB Network Management ("ABB Sugarland"), may have
made corrupt payments to public officials in Mexico to obtain
contracts with CFE Mexico.  According to ABB Switzerland, the
possible corrupt payments were paid by ABB Sugarland using three
intermediary companies, including Sorvill, a company owned by
ANGELA AGUILAR and her husband E.A.

-5-

11.    Based upon the information provided by ABB
Switzerland, the SEC conducted a financial investigation into
Sorvill, the other intermediary companies, ANGELA AGUILAR, E.A.,
and E.A.'s other companies.   The SEC discovered, among other
things, that another electrical supply company named L.M. had
made several large payments in the name of ANGELA AGUILAR and her
husband's company Grupo to Global Financial ("Global"), a
brokerage firm located in Houston, Texas.

12.   According to bank and brokerage records, Sorvill and
Grupo are controlled by ANGELA AGUILAR and her spouse E.A.   In
the Global records for Grupo, ANGELA AGUILAR claimed that she and
her husband were related to N.M., a Mexican public official who,
at the time of the L.M.'s payments to Grupo, was the Sub-Director
of Generation for CFE Mexico and later CFE Mexico's Director of
Operations.

13.    According to bank records, between September 2003
and May 2008, Grupo received approximately $5,330,022.38 in
payments from L.M.   There is probable cause to believe that the
money paid to ANGELA AGUILAR and others using the Grupo account
were actually bribes L.M. was paying to N.M. in exchange for
being awarded contracts from CFE Mexico.   In fact, records show
that ANGELA AGUILAR used part of the money L.M. paid to Grupo to
help buy N.M. a Ferrari automobile and a yacht costing over a
million dollars.   ANGELA AGUILAR also used Grupo money to make

-6-

over $100,000 in payments towards N.M.'s American Express (AMEX) credit card bills.  At the same time ANGELA AGUILAR was using L.M.'s payments to Grupo for the benefit of N.M., CFE Mexico, where N.M. serves as a foreign official, awarded nineteen (19) government contracts to L.M. worth approximately 160,029,918 Mexican pesos (or approximately $14,911,659 U.S. dollars).

C.   ORIGINS OF THE INVESTIGATION

14.   In June 2008, FBI Special Agent Susan Guernsey ("SA Guernsey") and I spoke with Tonia J. Tornatore ("Tornatore"), Senior Counsel, SEC Division of Enforcement and learned the following:

a.   On or about April 18, 2005, ABB Switzerland disclosed to the SEC and the DOJ that its subsidiary, ABB Sugarland, may have paid bribes to Mexican foreign officials at CFE Mexico.

b.   The potential bribes were paid to CFE Mexico through three intermediary companies, namely, Sorvill and two Mexican companies.

c.   The three intermediary companies were purportedly retained by ABB Sugarland to provide various services on contracts with CFE Mexico.

d.   However, ABB Switzerland conducted an internal

investigation and found that for many of the payments no goods or
services had been provided by the intermediaries.  In other
instances, the goods and services provided were not commensurate
with the size of the payments.

        e.     The investigation into ABB Sugarland's
payments to ANGELA AGUILAR and E.A.'s company Sorvill and other
intermediaries ultimately led to a guilty plea to a Superseding
Criminal Information by Fernando Maya Basurto, a former sales
representative of ABB Sugarland (SDTX CR-09-325), and the
indictment of John Joseph O'Shea, the former general manager of
ABB Sugarland (SDTX CR-09-629), in the Southern District of Texas
on FCPA related charges.  The investigation of other targets is
still on-going.

D.  <u>ANGELA AGUILAR's CONNECTION TO SORVILL AND GRUPO</u>

        15.     On or about November 3, 2008, I reviewed copies of
Sorvill's bank records from a Swiss bank account at UBS, which
the SEC had obtained pursuant to an information request from the
Swiss Federal Banking Commission.  Sorvill listed E.A. as the
Director of Sorvill and ANGELA AGUILAR as one of the signatories
on the bank account.  E.A.'s and ANGELA AGUILAR's control of the
Sorvill account was further indicated by the fact that their
Mexican passports were included in the Sorvill bank records I
reviewed.  Although all of the biographical information listed on

the passports was readable and consistent with other information
I reviewed, the photographs on the passports were unreadable.

16.     On July 12, 2008, I reviewed copies of
Grupo's Global Financial records, which the SEC had obtained
pursuant to an administrative subpoena.  The records for the
Grupo account again indicate ANGELA AGUILAR's control over the
account, as she was listed as the Director of Grupo and
personally authorized most of the payments made from the Grupo
bank account.

17.     On December 18, 2009, I reviewed copies of Grupo
invoices to L.M., as well as several emails obtained during an
FBI search of L.M.'s offices on November 20, 2008 pursuant to a
search warrant.  I learned from reading the emails, which were
attached to invoices at L.M., that E.A. was the one who directed
L.M. to pay Grupo by wire transfer into Grupo's Global account
ending in X871.

E.     L.M.'s DOMESTIC CONCERN STATUS

18.     On or about May 22, 2008, I reviewed search
results from a database commonly used by law enforcement
personnel and learned that L.M. was founded in 1947 and
incorporated in the State of California on July 5, 1962.  L.M. is
currently run by Dr. K.E.L., who is listed as L.M.'s president.

19.     On or about June 3, 2008, I learned from Ms.
Tornatore and L.M. website (www.l------usa.com) that L.M. is a

-9-

privately-held manufacturing company that specializes in utility products like Emergency Restoration Systems, Current and Voltage Monitoring Devices, and Transmission and Distribution Lines Hardware.  L.M. has supplied over 1000 Emergency Restoration System structures to over 50 Electric Transmission Asset Owners in over 20 countries, including Mexico.

20.    Based upon my review of law enforcement databases, my conversations with Ms. Tornatore, my internet searches and my training and experience, I have determined that L.M. qualifies as a "domestic concern" under the FCPA and that E.A. and ANGELA AGUILAR qualify as agents of that domestic concern under the FCPA.

F.  CFE MEXICO

21.    On or about June 3, 2008, I spoke with Ms. Tornatore, who is involved in the SEC's on-going investigation of ABB Sugerland's payments to CFE Mexico, and learned that CFE Mexico is a federal company owned by the Mexican government that, at the time generated, transmitted, and distributed electrical power to all of Mexico, except the Mexico City area.

G.  N.M.'s FOREIGN OFFICIAL STATUS

22.    On July 13, 2008, I performed various internet searches on the name N.M. and learned the following:

a.    The Business News America's website (www.bnamericas.com) contains a company profile for CFE Mexico

and currently lists N.M. as CFE Mexico's Operation Director and his email address as n-----.m-----@cfe.gob.mx.

       b.   According to news articles posted on the internet, N.M. has served as CFE Mexico's Operations Director since April 2007.  Before becoming the Operations Director, N.M. served as CFE Mexico's Sub-Director for Generation from 2002 to 2007.

    23.   Based upon my internet searches and my training and experience, I have determined that N.M. qualifies as a "foreign official" under the FCPA.

## H. CORRUPT PAYMENTS

    24.   For the reasons set forth below, there is probable cause to believe that L.M. wire transferred $2,262,301 into Grupo's Global account, which ANGELA AGUILAR and others then used to help buy N.M. a Ferrari automobile, a yacht costing over a million dollars, and to make over $100,000 in payments towards N.M.'s AMEX credit card bills.

## THE FERRARI

    25.   On July 10, 2008, SA Guernsey and I interviewed Bryant Kreaden (Bryant), the Sales Manager for Ferrari of Beverly Hills, located at 9372 Wilshire Blvd, Beverly Hills, California 90212 (the "Ferrari dealership"), and learned the following:

       a.   Bryant sold an individual who identified himself as E.A. a Ferrari in 2007.

-11-

       b.      E.A. came into the Ferrari dealership several times before purchasing the Ferrari and, on one occasion, was accompanied by someone who appeared to be his friend.

       c.      The person who appeared to be E.A.'s friend may have been the one who later picked up the car for E.A.

    26.    On July 10, 2008, myself and SA Guernsey interviewed Sharon Berman (Berman), the Office Manager for the Ferrari dealership, and learned the following:

       a.      On February 16, 2007, an individual identifying himself as E.A. executed a sales contract with the Ferrari dealership for the purchase of a 2005 Ferrari F430 F1 Spider at a cost of $297,500.

       b.      There is an undated "Statement of Facts" accompanying the sales contract that states,

> I/WE **ANGELA MARIA GOMEZ CEPEDA** THE UNDERSIGNED, HEREBY STATE THAT THE VEHICLE/VESSEL DESCRIBED ABOVE HAVE PAID IN FULL THE AMOUNT OF USD $297,500.00 (TWO HUNDRED NINETY SEVEN THOUSAND FIVE HUNDRED 00/100 USD) AND WITH THE PAYMENT TO BE APPLIED TO THE ABOVE-MENTIONED VEHICLE AND TITLED IN THE NAME OF **E.A.** I AUTHORIZE **MR. [N.M.]** TO PICK UP THE CAR AT YOUR FACILITIES………
>
> ……… I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE INFORMATION ENTERED BY ME ON THIS DOCUMENT IS TRUE AND CORRECT.

(emphasis added).  The "Statement of Facts" is signed "Angela M. Gomez de Aguilar" and includes her address and telephone number

in Cuernavaca, Mexico, which is consistent with other information

I have reviewed.

c.     An insurance document from Robert Moreno

Insurance Services lists the drivers of the Ferrari as E.A. and

N.M., and states that both E.A. and N.M. have been employees of

Global for twenty years.

d.     On or about February 16, 2007, ANGELA

AGUILAR wrote a check against Grupo's Global account in the

amount of $297,500 and made it payable to the Ferrari dealership.

27.   On July 11, 2008, I reviewed the Ferrari sales

contract and accompanying paperwork and observed the following:

a.     A sales contract between the Ferrari

dealership and E.A., with what purports to be E.A.'s signature on

the contract.

b.     A copy of a Mexican passport in the name

of ANGELA AGUILAR and a passport photograph that was unreadable.

The biographical information (name and date of birth) listed on

the passport in the Ferrari sales contract, however, matches the

biographical information listed on the copy of ANGELA AGUILAR's

passport contained in Sorvill's bank records.

28.   On July 11, 2008, I reviewed Grupo's Global

account records between February 1, 2007 and February 28, 2007

(the time period when the Ferrari was purchased from the Ferrari

dealership), and discovered a check written by ANGELA AGUILAR in

-13-

the amount of $297,500 that was posted to Grupo's Global account on February 23, 2007.

29.    On July 11, 2008, I reviewed L.M.'s Preferred Bank records (Account #XXXXXXXXXBB701) between January 18, 2007 and February 15, 2007 (the time period when the Ferrari was purchased from the Ferrari dealership for $297,500), and discovered that L.M. had wire transferred a total of $297,038.56 into Grupo's Global account.  There were no other wire transfers into Grupo's Global account during this time period and all of the wire transfers from L.M. referenced "CFE, Mexico," where N.M. was acting as a foreign official at the time.

THE YACHT

30.    On September 11, 2008, SA Guernsey and I interviewed Robin Goodman (Goodman), owner of South Shore Yacht Sales, located at 550 Marina Parkway D-3, Chula Vista, California 92154 (the "Yacht dealership"), and learned the following:

a.    Goodman was the broker for a Mexican buyer identified to him as N.M., who purchased a yacht costing $1.8 million.

b.    The yacht was purchased through a limited liability corporation named Baja Horizon.

c.    Goodman met N.M., who said he owned a metal company in Mexico.

d.    Goodman had N.M. sign all of the paperwork relating to the purchase of the yacht himself, including the

-14-

offer to purchase, the purchase agreement, the counter offer, and the conditional acceptance of vessel, because Goodman required the actual owner of the yacht to sign such paperwork.

   e.   Much of the transaction was handled by C.M., someone who said he was N.M.'s brother and lived in Chula Vista, California.

   f.   Although C.M. handled much of the transaction, C.M. made it clear to Goodman that the yacht was being purchased for his brother, N.M., who lived in Mexico and intended to take the yacht back to Mexico.

   g.   The payments for the yacht came in "lumps," some of it by wire transfer at E.A.'s direction, and some through a check signed by ANGELA AGUILAR.

   h.   Goodman did not recall meeting E.A., but said he thought he was N.M.'s business partner.

   31.   On July 12, 2008, I reviewed documents the yacht dealership provided to the SEC pursuant to an SEC subpoena and learned that three separate entities made payments totaling $1,800,000 towards the purchase of the yacht.  The first payment was a check for $540,000.  It came from Grupo's Global account and was dated August 28, 2006 and was signed by ANGELA AGUILAR. The second and third payments were wire transfers for $360,000 and $450,000.  The wire transfers came from Sorvill's bank account and were dated August 25, 2006 and September 11, 2006, respectively.  The payments from Sorvill were authorized by E.A.

The last five payments were wires transfers totaling $450,000.
The last five wire transfers came from Assets Management Plus, a
Mexican company about which little information is known at this
stage of the investigation.  The Asset Management Plus wire
transfers were dated September 18, 2006 ($85,900), September 21,
2006 ($91,430), September 21, 2006 ($79,220), September 22, 2006
($93,450), and September 27, 2006 ($100,000).

32.     On July 12, 2008, I reviewed Grupo's Global
account records from September 1 through November 30, 2006 (the
time period when Goodman sold N.M. the yacht) and discovered a
check made payable to "South Shore Yacht Sales" in the amount of
$540,000.  As in the documents provided by the Yacht dealership,
the check was dated August 28, 2006.

33.     On July 12, 2008, I reviewed L.M.'s Preferred Bank
records (Account #XXXX132) between September 29, 2006 and
November 28, 2006 (the time period when Goodman sold N.M. the
yacht).  During this time period, L.M. wire transferred a total
of $3,378,932.70 into Grupo's Global account.  Although the
amount of money L.M. transferred into Grupo's Global account
exceeded the cost of the yacht and the $540,000 withdrawn from
Grupo's Global account, I know, based on my training and
experience, that persons receiving bribe payments will often
purchase very expensive items like a home or a yacht using
multiple accounts in an effort to conceal the true source of the
funds.  Thus, the additional money L.M. wired into Grupo's Global

-16-

account was likely used, at least in part, to cover the payments towards the yacht that came from the accounts other than Grupo's Global account ($1,260,000). I further know, based on my training and experience, that intermediaries like Grupo and Sorvill will often receive a substantial fee for facilitating corrupt payments to foreign officials. Finally, if N.M. is, in fact, the brother-in-law of ANGELA AGUILAR or E.A., which ANGELA AGUILAR represented to Global, as explained below, then any funds remaining in the Grupo account could be considered funds for the benefit of N.M., in that they benefit his family.

THE AMEX BILLS

34.    On July 12, 2008, I reviewed a February 5, 2008 letter Jane E. Bates (Bates), Global's Chief Compliance Officer, wrote to the SEC and learned the following:

a.    Although N.M. did not have a brokerage account with Global, he did have a Corporate American Express (AMEX) credit card affiliated with Grupo.

b.    The payments for N.M.'s AMEX bills were paid by Grupo according to written instructions from ANGELA AGUILAR, acting as a Director of Grupo.

35.    On July 12, 2008, I reviewed N.M.'s AMEX statements from September 5, 2006 through January 5, 2008, and learned the following:

a.    N.M. incurred AMEX charges totaling $164,791.22.

-17-

b.      All of the payments towards N.M.'s AMEX balance were paid from Grupo's Global account.

c.      ANGELA AGUILAR signed forms authorizing the transfer of funds from Grupo's Global account to pay N.M.'s AMEX bill.

d.      Under the "must provide detailed explanation" section, ANGELA AGUILAR wrote "brother-in-law of company owner," as the apparent justification for paying N.M.'s AMEX bills.

36.     On July 12, 2008, I reviewed each of the wire transfers L.M. paid into Grupo's Global account from January 12, 2007 through October 12, 2007, excluding "the Ferrari" and "the Yacht" payments referenced above, and discovered that each of these wire transfers contained a reference to either "CFE" and/or "outside service and commission."

37.     On July 12, 2008, I reviewed all of the wire transfers between L.M. and Grupo's Global account, including those discussed in the Ferrari, the Yacht and the AMEX sections referenced above and discovered that they totaled $5,330,022.38.

I.   CONTRACTS BETWEEN L.M. AND CFE MEXICO

38.     On July 19, 2008, I reviewed printouts from the Mexican government's public access website for government documents, Portal de Obligaciones de Transparencia, at www.portaltransparencia.gob.mx/pot/, which lists, among other

-18-

things, the contracts between L.M. and CFE Mexico.  The printout

shows each contract and the amount of each contract, in Mexican

pesos.  According to this printout, L.M. was awarded the

following contracts from CFE Mexico:

a.  Contract number 700113303, starting on March 10, 2004, for 2,081,641 Mexican pesos.

b.  Contract number 700131808, starting on October 20, 2004, for 5,490,347 Mexican pesos.

c.  Contract number 700191011, starting on May 22, 2006, for 4,538,600 Mexican pesos.

d.  Contract number 700190421, starting on May 24, 2006, for 1,804,919 Mexican pesos.

e.  Contract number 700191352, starting on May 24, 2006, for 3,870,984 Mexican pesos.

f.  Contract number 800311925, starting on June 11, 2007, for $358,546 Mexican pesos.

g.  Contract number 700195528, starting on July 3, 2006, for 4,931,881 Mexican pesos.

h.  Contract number 700195444, starting on July 5, 2006, for 4,294,010 Mexican pesos.

i.  Contract number 700197454, starting on July 20, 2006, for 116,341,284 Mexican pesos.

j.  Contract number 700193790, starting on July 24, 2006, for 5,026,266 Mexican pesos.

k.  Contract number 700197867, starting on August

-19-

3, 2006, for 3,285,777 Mexican pesos.

l.   Contract number 700236626, starting on August 17, 2007, for 1,540,111 Mexican pesos.

m.   Contract number 700237280, starting on August 29, 2007, for 1,174,892 Mexican pesos.

n.   Contract number 700238137, starting on September 13, 2007, for 1,313,259 Mexican pesos.

o.   Contract number 700238282, starting on September 17, 2007, for 937,649 Mexican pesos.

p.   Contract number 700238207, starting on September 18, 2007, for 1,006,465 Mexican pesos.

q.   Contract number 700238918, starting on September 21, 2007, for 941,813 Mexican pesos.

r.   Contract number 700239186, starting on September 28, 2007, for 153,176 Mexican pesos.

s.   Contract number 700240396, starting on October 3, 2007, for 938,298 Mexican pesos.

39.   On or about September 25, 2008, I reviewed an online currency converter, as well as the currency exchange rate between the U.S. dollar and the Mexican peso for the time period of the above contracts.  Although there was some minor fluctuation over that period of time, the average exchange rate was roughly 9.3 Mexican pesos per one U.S. dollar.  Applying this average rate to L.M.'s Bank of America account records, I determined that between September 2, 2003 and July 18, 2008, CFE

Mexico wired contract payments to L.M. totaling approximately
$19,146,715.77 U.S. dollars.

## J.  LINK BETWEEN THE CONTRACTS AND L.M. PAYMENTS

40.  On or about November 3, 2008, I reviewed the memo
sections for each of the wire transfers sent from L.M.'s
Preferred bank account to Grupo's Global account between January
19, 2005 and February 14, 2007.  I discovered that on at least
six of the wire transfers, the numbers referenced in the memo
section of the wire transfer matched the contract numbers for
contracts CFE Mexico awarded to L.M. around that same time
period.

### IV.

### CONCLUSION

41.  Based on the foregoing, there is probable cause to
believe that between September 2003 and May 2008, L.M. made
payments into Grupo's Global account totaling $5,330,022.38.
ANGELA AGUILAR, who had control over Grupo's Global account,  and
others used $2,262,301 of that money to help buy N.M., a foreign
official, a Ferrari, a yacht, and to make over $100,000 in
payments towards his AMEX credit card bills.  During that same
time period, CFE Mexico, where N.M. served as a foreign official,
awarded L.M. nineteen (19) government contracts worth
approximately $14,911,659.  Accordingly, there is probable cause
to believe that ANGELA AGUILAR and others made corrupt payments
to a senior official in the Mexican government, in violation of

Title 15, United States Code, Sections 78dd-1, et seq. (Foreign

Corrupt Practices Act).

Date: _8/9/10_                    _____
                                 Farrell A. Binder
                                 Special Agent
                                 Federal Bureau of Investigation


Sworn and subscribed to before me
on this _8th_ day of August, 2010.

_____
United States Magistrate Judge

-22-