JANET I. LEVINE (STATE BAR NO. 94255)
MARTINIQUE E. BUSINO (STATE BAR NO. 270795)
Crowell & Moring LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071-2258
Phone: (213) 622-4750
Fax: (213) 622-2690
EMAIL: jlevine@crowell.com
EMAIL: mbusino@crowell.com

Attorneys for Defendant
Steve K. Lee

JAN L. HANDZLIK (STATE BAR NO. 47959)
THOMAS H. GODWIN (STATE BAR NO. 255384)
GREENBERG TRAURIG LLP
2450 Colorado Avenue, Suite 400 East
Santa Monica, California 90404
Phone: (310) 586-6542
Fax: (310) 586-0542
EMAIL: handzlikj@gtlaw.com
EMAIL: godwint@gtlaw.com

Attorneys for Defendants Lindsey Manufacturing
Company and Keith E. Lindsey

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 10-1031(A)-AHM |
| Plaintiff, | ) |
| | ) **DEFENDANTS' NOTICE OF** |
| | ) **MOTION AND MOTION TO** |
| v. | ) **DISMISS THE FIRST** |
| | ) **SUPERSEDING INDICTMENT;** |
| ENRIQUE FAUSTINO AGUILAR | ) **MEMORANDUM OF POINTS AND** |
| NORIEGA, ANGELA MARIA | ) **AUTHORITIES; [PROPOSED]** |
| GOMEZ AGUILAR, LINDSEY | ) **ORDER (FILED UNDER** |
| MANUFACTURING COMPANY, | ) **SEPARATE COVER)** |
| KEITH E. LINDSEY, and | ) |
| STEVE K. LEE, | ) |
| | ) Date: March 21, 2011 |
| Defendants. | ) Time: 3:00 p.m. |
| | ) Place: Courtroom 14 |
| | ) |
| | ) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Table of Authorities.................................................................................iii

MEMORANDUM OF POINTS AND AUTHORITEIS......................................2

I.      INTRODUCTION ...........................................................................2

II.     ARGUMENT ................................................................................5

      A.      The Court Should Dismiss The FSI Now Because Under
             No Set Of Facts Can The Government Establish Every
             Element Of The Charges...................................................................5

      B.      Employees Of State Owned Enterprises Are Not
             Foreign Officials ..........................................................................6

             1.      The Plain Meaning Of "Instrumentality" Excludes
                    State Owned Corporations......................................................6

      C.      Any Ambiguity In The Term "Instrumentality" Is Erased
             By The Legislative History Of The Fcpa, And In Any Case,
             This Court Should Resolve Any Ambiguity In Favor Of The
             Defendants ..................................................................................13

             1.      The History of the FCPA Shows that Congress
                    Deliberately Chose Not to Target Bribes Intended to
                    Influence State Owned Corporations....................................14

                   a.      Congress Rejected Bills Explicitly Addressing
                        Payments to State Owned Corporations When It
                        Passed the FCPA ..........................................................15

                   b.      1988 Amendments to the FCPA Reflect the
                        Omission of State Owned Corporations from the
                        Statute's Ambit..........................................................17

i

c.      The 1988 Amendments Further Illustrate That
Congress Did Not Consider State Owned
Corporations to be "Instrumentalities" ...................... 19

2.      The Rule of Lenity Requires that the Court Dismiss
Because, at a Minimum, the Government's Interpretation
of "Instrumentality" Is Not Unambiguously Correct ........... 21

D.      If "Instrumentalities" Does Include State Owned Enterprises,
The Statute Is Unconstitutionally Vague ....................... 22

E.      At A Minimum, The Statute Is Vague As Applied To The
Conduct Alleged In the FSI ............................................. 23

III.    CONCLUSION ....................................................................... 25

MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT

1

2

3

# **TABLE OF AUTHORITIES**

4

**Page(s)**

5

**CASES**

6

*Circuit City Stores, Inc. v. Adams,*
7
    532 U.S. 105 (2001) ...................................................................... 7, 8

8

*Edwards v. 360 Commc'ns,*
    189 F.R.D. 433 (D. Nev. 1999) ....................................................... 14

9

10

*Forbes v. Napolitano,*
    236 F.3d 1009 (9th Cir. 2000) ......................................................... 22

11

*Kolender v. Lawson,*
12
    461 U.S. 352 (1983) ........................................................................ 23

13

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,*
14
    __F.3d__, 2011 WL 383972 (9th Cir. Feb. 8, 2011) ............ 6, 7, 9, 13

15

*Public Citizen v. Department of Justice,*
16
    491 U.S. 440 (1989) ........................................................................ 13

17

*Religious Tech. Center v. Wollersheim,*
18
    796 F.2d 1076 (9th Cir. 1986) ......................................................... 14

19

*Skilling v. United States,*
20
    130 S. Ct. 2896 (2010) ....................................................... 22, 23, 25

21

*Smith v. Goguen,*
    415 U.S. 566 (1974) ........................................................................ 23

22

23

*United States v. Brooks,*
    610 F.3d 1186 (9th Cir. 2010) ........................................................... 7

24

*United States v. Carson, et al.,*
25
    No. SA CR 09-00077-JVS (C.D. Cal.) ......................................... 4, 5

26

*United States v. Covington,*
27
    395 U.S. 57 (1969) ............................................................................ 5

28

*United States v. Esquenazi, et al.*, No. 09-21010-CR-JEM (S.D. Fl.) ..................... 4

*United States v. Flores*,
    404 F.3d 320 (5th Cir. 2005) ......................................................... 5

*United States v. Granderson*,
    511 U.S. 39 (1994) .................................................................. 12, 21

*United States v. King*,
    244 F.3d 736 (9th Cir. 2001) ..................................................... 7, 8

*United States v. Napier*,
    861 F.2d 547 (9th Cir. 1988) ......................................................... 21

*United States v. Nguyen, et al.*,
    No. 08-522-TJS (E.D. Pa.) .......................................................... 4

*United States v. Panarella*,
    277 F.3d 678 (3d Cir. 2002) ......................................................... 6

*United States v. Santos*,
    553 U.S. 507 (2008) ............................................................ 7, 13, 21

*United States v. Shortt Accountancy Corp.*,
    785 F.2d 1448 (9th Cir. 1986) ....................................................... 5

**STATUTES**

15 U.S.C.
    § 78dd-2 ..................................................................................... 17
    § 78dd-2(a)(1) ............................................................................. 9
    § 78dd-2(a)(2) ............................................................................. 9
    § 78dd-2(b) ............................................................................... 10
    § 78dd-2(h)(2)(A) ....................................................................... 3
    § 78dd-2(h)(2)(B) ..................................................................... 10

18 U.S.C.
    § 1346 ...................................................................................... 23
    § 1839 ...................................................................................... 12

28 U.S.C. § 1603(b) (enacted Oct. 21, 1976) ...................................... 12

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No.
    111-203, 124 Stat. 1376, § 1504 (2010) .......................................... 9

MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT

Foreign Corrupt Practices Act. Pub. L. No. 95-213, 91 Stat. 1494 (1977)............. 17

International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No.
    105-366, 112 Stat. 3302 (1998).......................................................................... 20

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102
    Stat. 1107 (1988) (amending the Foreign Corrupt Practices Act of 1977
    (Pub. L. No. 95-123)) ....................................................................................... 19

Privileges and Immunities of International Organizations Act. 22 U.S.C. §
    288 ...................................................................................................................... 10

**OTHER AUTHORITIES**

*American Heritage Dictionary* (4th ed. 2000) ..................................................... 7, 8

*Black's Law Dictionary* (9th ed. 2009) ..................................................................... 7

*Business Accounting and Foreign Trade Simplification Act:  Joint Hearing
    before the Subcomm. on Securities and the Subcomm. on International
    Finance and Monetary Policy of the Comm. on Banking, Housing, and
    Urban Affairs,* 97th Cong. 151 (1981) ................................................................ 18

Exec. Order No. 13,395, 71 Fed. Reg. 3203 (Jan. 13, 2006) ................................. 10

Exec. Order No. 13,524, 74 Fed. Reg. 67803 (Dec. 16, 2009) .............................. 10

Fed. R. Crim. P.
    12(b)(2) ................................................................................................................ 5
    12(d) ..................................................................................................................... 5

H.R. 15149, 94th Cong. §§ 2(e) & (h) (1976)....................................................... 16

H.R. 3815, 95th Cong. (1977) ......................................................................... 16, 17

H.R. 7543, 95th Cong. (1977) ............................................................................... 16

H.R. REP. NO. 95-640 (1977)................................................................................. 11

H.R. REP. NO. 95-831 (1977) (Conf. Rep.) ............................................................ 17

*Multinational Corporations and United States Foreign Policy: Hearings
    Before the Subcomm. on Multinational Corporations of the Comm. on
    Foreign Relations*, 94th Cong. 1-2 (1975) (Statement of Sen. Church,
    Chairman of Subcomm.) ...................................................................................... 11

Organization for Economic Cooperation and Development Convention on
    Combating Bribery of Foreign Public Officials in International Business
    Transactions, Dec. 4, 1960, 12 U.S.T. 1728, 206 U.N.T.S. 143 .................. 19, 20

S. 305, 95th Cong. (1977)........................................................................ 16, 17

S. 3741, 94th Cong. (1976)....................................................................... 15, 16

S. REP. NO. 95-114 (1977) ............................................................................ 11

S. REP. NO. 99-486 (1986) ............................................................................ 18

*Webster's II New College Dictionary* (3d ed. 2005) ........................................ 7, 8

vi

1  TO: UNITED STATES ATTORNEY ANDRÉ BIROTTE JR., ASSISTANT

2  UNITED STATES ATTORNEY DOUGLAS M. MILLER, AND UNITED

3  STATES DEPARTMENT OF JUSTICE SENIOR TRIAL ATTORNEYS

4  NICOLA J. MRAZEK AND JEFFREY GOLDBERG:

5       PLEASE TAKE NOTICE that on Monday, March 21, 2011, at 3:00 p.m., or

6  as soon thereafter as the matter may be heard, in the Courtroom of the Honorable

7  A. Howard Matz, defendants Lindsey Manufacturing Company, Keith E. Lindsey,

8  and Steve K. Lee, by and through their counsel of record, will move this Court for

9  an order dismissing the First Superseding Indictment.

10      This motion is based on the accompanying Memorandum of Points and

11  Authorities, all files and records in this case, and any such arguments and evidence

12  as may be presented at or before the hearing on this motion.

13  DATED:  February 28, 2011        Respectfully submitted,

14

15                                   JANET I. LEVINE
                                     CROWELL & MORING LLP
16

17                                   /s/ Janet I. Levine_____
                                     By: JANET I. LEVINE
18                                   Attorney for Defendant
                                     Steve K. Lee
19

20

21                                   JAN L. HANDZLIK
                                     GREENBERG TRAURIG LLP
22

23                                   /s/ Jan L. Handzlik_____
                                     By: JAN L. HANDZLIK
24                                   Attorney for Defendants
                                     Lindsey Manufacturing Company and
25                                   Keith E. Lindsey
26

27

28

                    MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT
                                              1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

In the First Superseding Indictment ("FSI"), the government charged Lindsey Manufacturing Company ("LMC"), Keith E. Lindsey ("Dr. Lindsey"), LMC's President, and Steve K. Lee ("Mr. Lee"), the Company's Chief Financial Officer (herein "defendants"), with conspiring with Enrique Faustino Aguilar, a sales representative (and others unnamed and unidentified in the FSI), to violate the Foreign Corrupt Practices Act ("FCPA") and with certain substantive FCPA violations related to sales of LMC products to the Mexican Comisión Federal de Electricidad ("CFE").  To prove a FCPA violation, the government must prove a payment to a foreign official.  This motion raises the simple question: Does an officer or employee of a state owned corporation qualify as a foreign official?

The FSI charges that the CFE "was an electric utility company owned by the government of Mexico."  FSI[1] ¶ 3.[2]  According to the allegations in the FSI, Officials 1 and 2 held senior level positions at CFE, and this fact alone "made [them] 'foreign official[s],' as that term is defined in the FCPA . . . ."  *Id.* ¶¶ 4-5. The government is wrong to assert, as if it were settled law, that a position with a state owned corporation equates to status as a "foreign official" under the FCPA. In fact, this is not a settled issue, and the better view is that employees of state owned corporations are not foreign officials in the FCPA.

The FCPA defines "foreign officials" as "officer[s] or employee[s] of a foreign government or any department, agency, or instrumentality thereof, or of a

---

[1]    The FSI is attached as an exhibit in other motions filed concurrently herewith.

[2]    In the English language version of the CFE website, CFE acknowledges that it is "a company created and owned by the Mexican government." http://www.cfe.gob.mx/lang/en/Pages/thecompany.aspx.

public international organization," or individuals who acted "in an official capacity for or on behalf of any such government or department, agency, or instrumentality . . . ." 15 U.S.C. § 78dd-2(h)(2)(A).  The Act does *not* define "department, agency or instrumentality."  The government's theory is most likely that the CFE, a state owned corporation, is an "instrumentality," given the ordinary meanings of "department" and "agency."[3]

The government's theory has no basis in the text or the history of the FCPA, and is contradicted by the plain meaning of the term "instrumentality" in the context of the foreign official definition (and the FCPA as a whole), the legislative history of the statute, and Congress's purpose in enacting it.  And the government's theory, if accepted, would lead to absurd results.

The proper interpretation of "instrumentality" actually *excludes*, as a matter of law, state owned corporations.  And, if there is any ambiguity about the meaning of this term, doubt must be resolved in favor of the defendant.  Under either view, the Court should dismiss the FSI because it hinges on the flawed legal theory that CFE employees are foreign officials.  In the alternative, the Court should dismiss the FSI as it hinges on an unconstitutionally vague statute.

This is a matter of almost first impression.  Similar, but not identical, issues have been raised in two district cases, neither in this circuit.[4]  Another court in this

---

[3]   Although the CFE describes itself as an "agency" on its website, it is nevertheless a state owned corporation, *see, supra*, note 1, FSI ¶ 3, and, in any case, what CFE calls itself is of no moment.  Defendants argue in this motion that the text and legislative history of the FCPA establish that Congress did not intend to address payments to state owned corporations with the FCPA (or that, in the alternative, the statute is vague on the question).  What one of these entities calls itself in a particular case, and into which prong of the "foreign official" definition the government claims a particular corporation falls, is irrelevant to these issues.

[4]   In the Eastern District of Pennsylvania and the Southern District of Florida, courts denied pretrial motions to dismiss based on somewhat similar arguments about the "foreign official" element.  These decisions are obviously not binding,

district will consider an argument much like that presented here.  On February 21, 2011, the defendants in an FCPA case before the Honorable James V. Selna filed a motion similar to the present motion.  *United States v. Carson, et al.*, No. SA CR 09-00077-JVS (C.D. Cal.), Defendants' Notice of Motion and Motion to Dismiss Counts One through Ten of the Indictment and Memorandum in Support Thereof (Docket No. 304).[5]

and they should be given little weight for several reasons.  First, the defendants in these cases argued that proof that a payment was made to an employee of an "instrumentality" required proof that the government controlled entity in question was wholly owned by the government *and* performed a purely public function*, an argument distinct from that presented here.  *See generally United States v. Nguyen, et al.*, (hereinafter *Nguyen*), No. 08-522-TJS (E.D. Pa.), Motion to Dismiss Superseding Indictment for Failure to State a Criminal Offense and for Vagueness ("Motion to Dismiss") (Docket No. 110); *United States v. Esquenazi, et al.*, (hereinafter *Esquenazi*), No. 09-21010-CR-JEM (S.D. Fl.), Defendant Joel Esquenazi's (Corrected and Amended) Motion to Dismiss Indictment for Failure to State a Criminal Offense and for Vagueness ("Motion to Dismiss") (Docket No. 283).  Defendants' chief argument in the present motion is distinct.  Second, in neither case did the defendants offer as much detail about the legislative history as LMC, Dr. Lindsey, and Mr. Lee do in the present motion.  *See generally Nguyen,* Motion to Dismiss (Docket No. 110); *Esquinazi,* Motion to Dismiss (Docket No. 283).  Third, in *Esquenazi,* the court's principle ground for denying the motion was that it perceived the defendants' arguments to be factual in nature and thus premature, a criticism not applicable to this motion.  *Esquenazi,* Order Denying Motion to Dismiss Indictment ("Order") (Docket No. 309), 2-3 (addressing the "foreign official" element substantively only in *dicta,* having already ruled that the motion was premised on factual arguments and thus premature).  The Eastern District of Pennsylvania court did not explain at all its rationale for denying the motion to dismiss in *Nguyen*.  *Nguyen*, Order that Motion to Dismiss Superseding Indictment is Denied ("Order") (Docket No. 144).  Finally, in neither case did the courts explain their rationale for conclusions about the meaning of the term "foreign official."  *Esquenazi,* Order (Docket No. 309), 3; *Nguyen*, Order (Docket No. 144).

[5]   The defendants in *United States v. Carson* submitted with their motion a declaration by Michael J. Koehler, Associate Professor of Business Law at Butler University, well known for his scholarship and public speaking regarding the

## II.    ARGUMENT

### A.    The Court Should Dismiss The FSI Now Because Under No Set Of Facts Can The Government Establish Every Element Of The Charges

The Court should rule on the defendants' motion before trial because it "can determine [the objections] without a trial of the general issue." Fed. R. Crim. P. 12(b)(2).  Indeed, the Federal Rules state that the Court "*must* decide every pretrial motion before trial unless it finds good cause to defer a ruling." Fed. R. Crim. P. 12(d) (emphasis added).  The Rules contemplate that a court can decide a motion based on factual issues by requiring, in those cases, that the court "state its essential findings on the record." *Id*.  A court may dismiss charges pretrial where trial "would be of no assistance in determining" their validity. *United States v. Covington,* 395 U.S. 57, 60 (1969).  "A pretrial motion is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (internal citation and quotations omitted).  This approach "avoids the waste of judicial resources" that would result from taking legally meritless cases to trial. *United States v. Flores*, 404 F.3d 320, 323, 325 (5th Cir. 2005) (affirming district court's decision to resolve before trial whether, given undisputed facts, defendant was "illegally or unlawfully in the United States," a prerequisite for violation of statute).

---

FCPA and for his "FCPA Professor" blog, which is available at http://fcpaprofessor.blogspot.com/.  The declaration comprehensively outlines the legislative history of the FCPA and includes excerpts of the cited congressional record as exhibits. *See United States v. Carson, et al.*, No. SA CR 09-00077-JVS (C.D. Cal.), Declaration of Professor Michael J. Koehler in Support of Defendants' Motion to Dismiss Counts One through Ten of the Indictment, and Exhibits Thereto (Docket Nos. 305 & 306) (hereinafter "Koehler Dec.").

None of the issues raised by the instant motion rests on disputed facts and none is dependent on further finding of fact. Defendants argue that, no matter what other characteristics of CFE the government may attempt to prove at trial, and assuming that all of the allegations in the FSI are true, as a matter of law no state owned corporation is an "instrumentality," meaning that no CFE employee is a "foreign official" under the FCPA. If the Court agrees, the Court must find that the government cannot prove the allegation that defendants made payments to, or conspired to make payments to, a "foreign official" and thus cannot prove the charged violation of the FCPA and conspiracy to violate the FCPA (and the parasitic money laundering charges), no matter what evidence the government intends to introduce about other characteristics of the CFE. In the alternative, defendants argue that the term "instrumentality" is unconstitutionally vague, another purely legal issue. *See United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (stating that the court must dismiss an indictment that alleges each element of an offense if "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation").

### B.   Employees Of State Owned Enterprises Are Not "Foreign Officials"

#### 1.   The Plain Meaning of "Instrumentality" Excludes State Owned Corporations

It is plain from the definition of "foreign official" that Congress did not intend for FCPA liability to be based on payments made to employees of state owned corporations like CFE. Statutory analysis begins, of course, with the "the language of the statute. When the plain meaning of a statutory provision is unambiguous, that meaning is controlling." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, __F.3d__, 2011 WL 383972, *12 (9th Cir. Feb. 8, 2011) (internal citations and quotations omitted).

1    In attempting to discern the "plain meaning" of a term that is not defined,

2  courts turn first to the term's "ordinary meaning." *United States v. Santos*, 553

3  U.S. 507, 511 (2008).  The Ninth Circuit has held that "words are to be judged by

4  their context and that words in a series are to be understood by neighboring words

5  in a series," a principle known as *noscitur a sociis*.  *United States v. King*, 244 F.3d

6  736, 740-41 (9th Cir. 2001) (internal citations and quotations omitted).  A

7  particular iteration of this doctrine is the cannon of *ejusdem generis*, which

8  provides that "'[w]here general words follow specific words in a statutory

9  enumeration, the general words are construed to embrace only objects similar in

10  nature to those objects enumerated by the preceding specific words.'"  *Circuit City*

11  *Stores, Inc. v. Adams,* 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer,

12  *Sutherland on Statutes and Statutory Construction* § 47.17 (1991)); *United States*

13  *v. Brooks*, 610 F.3d 1186, 1201 n.6 (9th Cir. 2010) (quoting *Circuit City Stores*,

14  532 U.S at 114-15).  Finally, "[t]o determine the plain meaning of a statutory

15  provision," courts "examine not only the specific provision at issue, but also the

16  structure of the statute as a whole, including its object and policy."  *Levi Strauss &*

17  *Co.*, 2011 WL 383972, *12 (internal citations and quotations omitted); *see also*

18  *Santos*, 553 U.S. at 512 ("Since context gives meaning," courts examine terms in

19  question "not in isolation but as . . . used in the [relevant] statute.").

20    According to *Webster's II New College Dictionary*, the ordinary meaning of

21  instrumentality is "the quality or state of being instrumental," which, in turn,

22  means "serving as a means or agency: implemental," or "of, relating to, or done

23  with an instrument or tool."  *Webster's II New College Dictionary* ("*Webster's II*")

24  589 (3d ed. 2005).[6]  In turn, *Webster's II* defines "to govern" as "to set forth and

25  ─────────────────────
  [6]    *See also American Heritage Dictionary* 908 (4th ed. 2000) (defining

26  instrumentality as "[a] means; an agency," or "[a] subsidiary branch, as of a

27  government, by means of which functions or policies are carried out"); *Black's*

28  *Law Dictionary* 870 (9th ed. 2009) (defining instrumentality as "[a] thing used to

administer the public policy or public affairs of," or "to exercise political authority." *Webster's II* at 492-93 (also including more generic definitions). [7]

Thus, the most ordinary meaning of an "instrumentality of the government," is an entity the government uses to accomplish its functions of setting forth and administering public policy or public affairs, or exercising political authority. In the context of the foreign official definition in the FCPA, where the term follows two other terms with definite meaning in the law (and organization of the U.S. government), under the doctrines *noscitur a sociis* and *ejusdem generis*, "instrumentality" must be understood to describe entities similar to agencies and departments or – if it is meant as a general term to capture multiple categories of government entities – it must be understood to capture *only* entities that share qualities both agencies and departments share. *See King*, 249 F.3d at 740-41; *Circuit City Stores, Inc.*, 532 U.S. at 114-15. Under either interpretation, "instrumentalities" most likely would include entities like government branches, ministries, bureaus, boards, administrations, commissions, and militaries, among others. Like government departments and agencies, such entities only exist in government, and only at the pleasure of governments. They are funded only by governments. They orient to policies and/or public policy. Finally, the extent of their powers are defined and uniform within each state. Corporations, as a category, have no place in this group. Unlike agencies and departments, corporations can take myriad forms and are created and operated in innumerable ways and for infinitely variable purposes.

---

achieve an end or purpose," or "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body").

[7]   *See also American Heritage Dictionary* at 760 (defining govern as "[t]o make and administer the public policy and affairs of; exercise sovereign authority in," or "to exercise political authority," among other ways).

The lack of uniformity in how state owned corporations are formed and operated contrasts starkly with the defined scope of the terms that precede "instrumentality," and it is impossible to identify any characteristic that the first two categories (departments, agencies) necessarily have in common with government/state owned corporations.  For these reasons, the doctrines of *noscitur a sociis* and *ejusdem generis* establish that instrumentalities must mean something different than state owned corporations.[8]

Moreover, "the structure of the [FCPA] as a whole, including its object and policy" make clear that Congress did not intend to include state owned corporations when it passed the Act and defined "foreign officials."  *See Levi Strauss & Co.*, 2011 WL 383972, *12 (stating that a court must look to the structure of a statute and its purpose in understanding the plain meaning of a term). First, the statute prohibits corrupt payments not only to officials of departments, agencies, or instrumentalities, but also to officials of "public international organizations," 15 U.S.C. § 78dd-2(a)(1), *id.* § 78dd-2 (h)(2)(A) (defining "foreign official" to include "public international organization[s]"), and to "any foreign political party or official thereof or any candidate for foreign political office,"  15 U.S.C. §  78dd-2(a)(2).  Public international organizations are "organization[s] in

---

[8]    A provision in the recent Dodd-Frank Wall Street Reform and Consumer Protection Act illustrates the point that, when listed immediately after "department" and "agency," instrumentality must encompass only entities very closely analogous to those entities.  The Act requires resource extraction issuers to disclose certain payments to foreign governments.  Pub. L. No. 111-203, 124 Stat. 1376, § 1504 (2010).  It provides that "foreign government" "includes a department, agency, or instrumentality of a foreign government, *or* a company owned by a foreign government, as determined by the Commission."  *Id.* (emphasis added).  The provision illustrates the point that the natural reading of "instrumentality" when listed with "department" and "agency" does not include state owned corporations, and that Congress knows how to address corporations when it desires to do so.

which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation, and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities" provided for in the Privileges and Immunities of International Organizations Act.  22 U.S.C. § 288; *see* 15 U.S.C. § 78dd-2(h)(2)(B) (defining "public international organization[s]" by reference to Executive orders made pursuant to section 1 of the International Organizations Immunities Act or for purposes of the FCPA).  Examples include the International Criminal Police Organization ("Interpol") and the Global Fund To Fight AIDS, Tuberculosis and Malaria ("Global Fund").  Exec. Order No. 13,524, 74 Fed. Reg. 67803 (Dec. 16, 2009) (Interpol); Exec. Order No. 13,395, 71 Fed. Reg. 3203 (Jan. 13, 2006) (Global Fund).  Public international organizations, political parties, and candidates – like agencies and departments – all bring to mind traditional and purely governmental roles or processes in a way that state owned corporations simply do not.[9]  Likewise, the fact that the FCPA includes an exception for payments made to influence "routine *governmental* action" emphasizes how central commonly-understood concepts of government and politics are to the FCPA.  *See* 15 U.S.C. § 78dd-2(b) (emphasis added).

This is in line with the Congressional purpose in enacting the FCPA. Congress's investigation of bribery of "foreign officials" stretched back to at least 1975, two years before Congress passed the FCPA, when the Senate Subcommittee on Multinational Corporations held a hearing on the subject of political

---

[9]     Sesame Street characters often sing:  "One of these things is not like the others; One of these things just doesn't belong."  Joe Raposo and Jon Stone, *One Of These Things (Is Not Like The Others)*, on The Sesame Street Book & Record (Columbia Records 1970), http://members.tripod.com/tiny_dancer/one.html.  This song is apt to this argument – state owned corporations are just not like anything else encompassed in the FCPA.

contributions to foreign states made by U.S. corporations.  *See generally Multinational Corporations and United States Foreign Policy: Hearings Before the Subcomm. on Multinational Corporations of the Comm. on Foreign Relations*, 94th Cong. 1-2 (1975) (Statement of Sen. Church, Chairman of Subcomm.) (hereinafter *Multinational Corporations Hr'g*); Koehler Dec. ¶ 28.  The issue arose in the wake of the Watergate investigation which revealed that many American corporations routinely made political contributions in the United States, and the Securities and Exchange Commission report to Congress which revealed that many companies neglected to report to shareholders the payments they made to foreign governments.  *Multinational Corporations Hr'g* at 1-2; Koehler Dec. ¶ 28.  When, two years later, Congress passed the FCPA, Congress had in mind the impact that the corruption of foreign officials had on international governmental politics.  That is, lawmakers were troubled that American corporations admitted to bribery of "foreign government officials, politicians, and political parties" not just because bribery is inherently unflattering to U.S. companies and unnecessary, but because corrupting foreign governments caused special harm.  H. R. REP. NO. 95-640, at 5 (1977) (describing "severe foreign policy problems" caused by corporate bribery); *see also* S. REP. NO. 95-114, at 3 (1977) ("Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people.  The image of American democracy abroad has been tarnished.").

The examples of embarrassing corruption cited most often as Congress contemplated various bills leading up to the FCPA were cases in which bribes were paid to traditional government figures, namely the Prime Minister of Japan, a Prince of the Netherlands (the Queen's husband, and also the Inspector General of the Dutch Armed Forces), and various purely governmental officials in Italy – the President, the Prime Minister, and defense ministers among them.  *See, e.g.*, H.R.

REP. NO. 95-640 at 5.  Congress could have criminalized and thus limited all bribery abroad.  It chose not do so and instead, when it passed the FCPA, had in mind only the relatively narrow – albeit serious – problem of the impact of bribery on governmental affairs.  The language it chose to address this narrow issue should, accordingly, be construed narrowly.

In addition, the language in a statute enacted *before* the FCPA demonstrates that Congress was aware of the concept of state owned corporations and was capable of drafting legislation which defined "instrumentality" to include them; it chose not to do so with the FCPA.  The Foreign Sovereign Immunities Act, for example, which defines the scope of foreign officials' immunity from enforcement of U.S. law, includes as a definition of "instrumentality" "any entity . . . which is an organ of a foreign state or political subdivision thereof, *or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof.*"  28 U.S.C. § 1603(b) (enacted Oct. 21, 1976) (emphasis added).  The Economic Espionage Act, passed after the FCPA, demonstrates that even after Congress enacted the FCPA, Congress did not interpret "instrumentality" to *per se* include state owned corporations.  That Act  specifies that "foreign instrumentalities" includes, among other things, "*a . . . corporation, firm, or other entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government*").  18 U.S.C. § 1839 (enacted Oct. 11, 1996).  These statutes further demonstrate that, in the absence of evidence to the contrary, the Court should conclude that Congress did not intend to address such a wide swath of entities with a single term grouped with two other, more narrow, terms.

Finally, the alternative interpretation, that state owned corporations *are* included among "instrumentalities," would lead to absurd results, an outcome the Court should avoid.  *See United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994)

1    (declining to adopt a definition that would have led to "an absurd result"); *Public*

2    *Citizen v. Department of Justice*, 491 U.S. 440, 454 (1989) (stating that the court

3    must look for "other evidence of congressional intent to lend [a] term its proper

4    scope, [w]here the literal reading of a statutory term would compel an 'odd

5    result.'") (internal citations omitted).  If it were true that state owned corporations

6    were contemplated by the FCPA then some U.S. citizens, living and working in the

7    U.S., but employed by foreign state owned corporations, such as CITGO, would

8    qualify as "foreign officials."  Similarly, employees of companies that have been

9    nationalized by their sovereigns the world over – suddenly, temporarily, and only

10   due to crises – such as the Royal Bank of Scotland, the Anglo Irish Bank, and

11   Northern Rock – would would qualify as "foreign officials."  Congress could not

12   have intended either of these results, and the Court should interpret the FCPA to

13   avoid them.  In light of the plain meaning of the term "instrumentality," the Court

14   should dismiss the FSI for failure to state a criminal violation as a matter of law.

**C.    Any Ambiguity In The Term "Instrumentality" Is Erased By The Legislative History Of The FCPA, And In Any Case, This Court Should Resolve Any Ambiguity In Favor Of The Defendant**

18   Congress has, on several occasions, declined to bring state owned

19   corporations into the FCPA's ambit.

20   The Ninth Circuit's "well established" rules of statutory construction

21   provide that, "[i]f ambiguity exists," the Court "may use legislative history as an

22   aid to interpretation." *Levi Strauss & Co.*, 2011 WL 383972, at * 12 (internal

23   citations and quotations omitted).  However, if in the Court's view, ambiguity

24   persists even after the Court has exhausted its tools of statutory construction, "a

25   long line of [Supreme Court] decisions" holds that "the tie must go to the

26   defendant." *Santos*, 553 U.S. at 514.  This doctrine clearly dictates that the Court

27

28

must dismiss the FSI if it remains unconvinced about the scope of "instrumentality" in the FCPA.

### 1. The History of the FCPA Shows that Congress Deliberately Chose Not to Target Bribes Intended to Influence State Owned Corporations

Congress has deliberately chosen not to regulate payments to state owned corporations in the FCPA. In the years leading up to 1977, when it passed the FCPA, both the 94th and the 95th Congresses rejected bills that would have explicitly addressed payments to employees of state owned corporations. In 1988, Congress made amendments that emphasized the focus of the Act was classic "governmental action." Finally, in 1998, in making some changes to the statute to conform to parts of the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, Congress chose not to fully incorporate into U.S. law that Convention's definition of "foreign public official," specifically by *not* incorporating into the FCPA definition of "foreign official" employees of state owned enterprises. Significantly, Congress *did* incorporate into U.S. law other elements of the Convention's definition of foreign officials.

This history evinces Congressional intent to address only a narrow range of conduct with the FCPA and, specifically, to not address payments to employees of state owned corporations. "Where regulatory or statutory language is rejected by a promulgating body, its absence provides an indication that the body did not wish to have the issue considered." *Edwards v. 360 Commc'ns*, 189 F.R.D. 433, 436 (D. Nev. 1999) (citing Norman J. Singer, 2A *Sutherland Statutory Construction* § 48.04, at 325 (5th ed. 1992)); *see Religious Tech. Center v. Wollersheim*, 796 F.2d 1076, 1085-86 (9th Cir. 1986) (concluding that RICO does not allow private parties to seek injunctive relief after reviewing history showing that Congress

considered the idea but rejected bills and later amendments to the statute that would have provided for such remedies).

### a.   Congress Rejected Bills Explicitly Addressing Payments to State Owned Corporations When It Passed the FCPA

The bill now known as the FCPA passed in 1977.  Congress enacted this version after considering more than twenty bills.  The bills Congress considered before that differed in many ways.  For example, some proposed only to increase reporting requirements for public companies, while others proposed to criminalize certain payments.  *See generally* Koehler Dec. at ¶¶ 28-280.  The bills also differed in how they defined the category of entities that would trigger the Act.  *See generally id.*  Among these bills were several that explicitly contemplated state owned corporations.

For instance, on August 6, 1976, Senator Magnuson introduced S. 3741. The bill would have required U.S. corporations or their foreign affiliates to report payments in connection with official actions of foreign public officials.  The bill defined "foreign public officials" as, essentially, officers, employees or others acting on behalf of a foreign government.  S. 3741, 94th Cong. § 2(e) (1976).  In turn, the bill defined "foreign government" to explicitly include corporations owned by foreign states:

> (1) The government of a foreign country, irrespective of recognition by the United States; (2) a department, agency, or branch of a foreign government; (3) *a corporation or other legal entity established or owned by, and subject to control by, a foreign government*; (4) a political subdivision of a foreign government, or a department agency, or branch of the political subdivision; or (5) a public international organization.

S. 3741, § 2(h) (emphasis added).  A House bill mirrored this Senate proposal.  *See* H.R. 15149, 94th Cong. §§ 2(e) & (h) (1976).  Both bills were referred to committee, but no further action was taken on either.

In the 95th Congress, the House again considered, among other bills, a bill that explicitly referred to government owned corporations.  Like its predecessors, H.R. 7543 focused on the *reporting* of certain payments made abroad, as opposed to *prohibiting* such payments.  H.R. 7543, 95th Cong. § 401 (1977) (emphasis added).  The bill defined "foreign government" as:

> (A) the government of a foreign country, whether or not recognized by the United States; (B) a department, agency, or branch of a foreign government; (C) a political subdivision of a foreign government, or a department, agency, or branch of such political subdivision; (D) *a corporation or other legal entity established, owned, or subject to managerial control by a foreign government*; or (E) a public international organization.

H.R. 7543 § 103(3) (emphasis added).

On January 18, 1977, Senator Proxmire introduced the Senate bill that ultimately – in compromise with a parallel bill from the House, H.R. 3815 – become the FCPA, S. 305.  S. 305, 95th Cong. (1977).  The bill generally prohibited payments to "official[s] of a foreign government or instrumentality" but did not define "instrumentality."  S. 305, § 30A.  H.R. 3815 also prohibited certain payments to "foreign officials," which it defined as:

> [A]ny officer or employee of a foreign government or any department, agency, or instrumentality thereof, or any person acting in an official capacity for or on behalf of such government or department, agency or instrumentality.  Such terms do not include any employee of a foreign government or any department, agency, or

instrumentality thereof whose duties are ministerial or clerical.

H.R. 3815, 95th Cong. § 30A(e)(2) (1977).  The Senate agreed during Conference to include the House's definition in any final bill.  H.R. REP. NO. 95-831, at 12 (1977) (Conf. Rep.).  The conference version of S. 305 and H.R. 3815, incorporating this definition, became The Foreign Corrupt Practices Act.  Pub. L. No. 95-213, 91 Stat. 1494 (1977) (current version at 15 U.S.C. § 78dd-2)); *see* Koehler Dec. ¶¶ 269-78 (describing details of the 1977 adoption of the Act).

As this history demonstrates, Congress was cognizant of state owned corporations as it considered the proper scope for what would become the FCPA. While some Senators and Representatives obviously favored addressing payments meant to influence state owned corporations with the legislation, language which would have clearly accomplished that was not included in the legislation.  This Court should reject the government's attempt to expand the law beyond Congressional intent.

> **b.**    **1988 Amendments to the FCPA Reflect the Omission of State Owned Corporations from the Statute's Ambit**

The history of amendments to the FCPA confirm that Congress did not intend that it would be used to address payments to state owned corporations. First, the original FCPA indirectly excused so-called "grease" or "facilitation payments," which Congress never intended to criminalize.  It did so by defining "foreign official" to *exclude* "any employee of a foreign government or any department, agency or instrumentality whose duties are essentially ministerial or clerical."  Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, § 104(d)(2), 91 Stat. 1494 (1977) (amended 1988, 1998).  Congress discovered that this exception was difficult for corporations to understand, however, because it rested on understanding individuals' duties, which varied from entity to entity and

country to country.  One speaker, discussing the "ministerial or clerical duties"
exclusion, noted that:

> [i]n practice this approach has failed to achieve
> Congress' intent.  Even in our own federal government, it
> is difficult to know when an official has "essentially
> ministerial or clerical" duties.  The problem is acute in
> foreign countries where duties of government employees
> are less clearly articulated and usually are not readily
> available in published form.

*Business Accounting and Foreign Trade Simplification Act:  Joint Hearing before
the Subcomm. on Securities and the Subcomm. on International Finance and
Monetary Policy of the Comm. on Banking, Housing, and Urban Affairs,* 97th
Cong. 151 (1981) (Prepared Statement of Robert L. McNeill, Executive Vice
Chairman, Emergency Comm. for American Trade).

Congress decided to address this issue by defining "facilitating payments"
not in terms of recipients, as the original Act had, but in terms of the *purpose* of
allegedly or potentially corrupt payments.  Various iterations of what became the
final amendment illustrate this.  *See, e.g.*, S. REP. NO. 99-486, at 12 (1986)
(providing "section-by-section" analysis of S. 430, and noting that the bill "would
remove uncertainty about the facilitating payments exception by defining such
payments in terms of their *purpose*") (emphasis added); *see generally* Koehler
Dec. ¶¶ 281-383 (describing ten-year history of attempts to amend the FCPA in
many respects, including this one).  Congress accomplished its goal by removing
the exclusion language from the definition of "foreign official" and by adding an
exception for facilitating payments for "routine government action."  Specifically,
Congress inserted the following:

> [The FCPA's anti-bribery provisions] shall not apply to
> any facilitating or expediting payment to a foreign
> official, political party, or party official the purpose of
> which is to expedite or to secure the performance of

*routine governmental action* by a foreign official,
political party, or party official.

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5003,
102 Stat. 1107 (1988) (amending the Foreign Corrupt Practices Act of 1977 (Pub.
L. No. 95-123)) (emphasis added).

Congress's decision to define facilitating payments in terms of whether the
payor intended to secure cooperation on routine *governmental* action illustrates the
point that is clear from the history of the original FCPA:  When it enacted and
amended the FCPA, Congress did not have in mind government corporations – or
corporate action – it had in mind a discernable and definite universe of
governmental action.

### c.    The 1998 Amendments Further Illustrate That Congress Did Not Consider State Owned Corporations to be "Instrumentalities"

In 1998, Congress again amended the FCPA, this time to implement
portions of the Organization for Economic Cooperation and Development
Convention on Combating Bribery of Foreign Public Officials in International
Business Transactions, Dec. 14, 1960, 12 U.S.T. 1728, 888 U.N.T.S. 179
(hereinafter "OECD Convention").[10]  However, Congress did not change the FCPA
to mirror the OECD Convention exactly, and its decision to omit one element of
the Convention from the U.S. amendment is particularly telling.

---

[10]     The text of the OECD Convention and related documents, including
"Commentaries on the Convention on Combating Bribery of Foreign Public
Officials in International Business Transactions," adopted by the Negotiating
Conference on Nov. 21, 1997 (hereinafter "OECD Convention Commentaries"),
are available at http://www.oecd.org/dataoecd/4/18/38028044.pdf.

MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT
19

For purposes of the OECD Convention, which required, among other things, that signatories criminalize payments to "foreign public officials," that term was defined as follows:

> any person holding a legislative, administrative or judicial office of a foreign country, whether appointed or elected; any person exercising a public function for a foreign country, including for a public agency or *public enterprise*; and any official or agent of a public international organization.

OECD Convention, art. 1, 4(a) (emphasis added).[11]  In 1998, Congress added the "public international organization" element of this definition to the FCPA definition of "foreign official," but did not otherwise amend that definition. International Anti-Bribery and Fair Competition Act of 1998, Pub. L. No. 105-366, § 3, 112 Stat. 3302 (1998).  Congress could have adopted the extra "enterprise" element of the OECD definition, but chose not to, and the Court should not graft it onto the statute now.[12]   This is yet another clear sign that Congress did not intend that individuals or corporations would be prosecuted for payments to state owned corporations under the auspices of the FCPA.

---

[11]    Both the text of this provision and OECD Commentaries establish that not all state owned corporations satisfy the OECD definition of "foreign public official."  As the text makes clear, employees of public enterprises are contemplated only if they "exercise a public function for" the foreign country at issue.  OECD Convention, art. 1, 4(a).  Commentary 15 to the Convention provides that "[a]n official of a public enterprise shall be deemed to perform a public function unless the enterprise operates on a normal commercial basis in the relevant market, *i.e.*, on a basis which is substantially equivalent to that of a private enterprise, without preferential subsidies or other privileges."  OECD Convention Commentaries, *supra* note 10, Commentary 15, at 14.

[12]    Another example of a point of departure between the OECD and the FCPA is that the OECD does not contain an express exception for facilitation payments. *See generally* OECD Convention.

MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT
20

In sum, the legislative history of the FCPA in place at the time relevant to this FSI helps illuminate any ambiguity in the statute, and makes clear what the text of the statute does as well.  As a matter of law, therefore, CFE employees should not be held to be "foreign officials."

## 2. The Rule of Lenity Requires that the Court Dismiss Because, at a Minimum, the Government's Interpretation of "Instrumentality" Is Not Unambiguously Correct

As demonstrated above, "instrumentality" cannot reasonably be interpreted to include state owned corporations, and Congress intended to exclude such entities from the grasp of the FCPA.  However, if the Court finds that there *is* any ambiguity in the meaning of "foreign official," or more specifically, "instrumentality," the Court should resolve it in the defendants' favor pursuant to the rule of lenity, and dismiss the FSI.  "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subject to them."  *Santos*, 553 U.S. at 514.

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Id*.  If the government cannot establish that its position is "unambiguously correct" by reference to "text, structure, and history," the Court must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor."  *Granderson*, 511 U.S. at 54; *United States v. Napier*, 861 F.2d 547, 548-49 (9th Cir. 1988) ("It has long been settled that . . . one is not to be subjected to a penalty unless the words of the statute plainly impose it," consistent with *Santos*, *supra*) (internal citations and quotations omitted).

MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT
21

1  Pursuant to these principles and for all of the reasons given above, the Court
2  should dismiss the FSI.

3  **D.    If "Instrumentalities" Does Include State Owned Enterprises, The**
4  **Statute Is Unconstitutionally Vague**

5  In the alternative, if the Court is unconvinced that the term "instrumentality"
6  does not, as a matter of law, exclude state owned corporations, the Court should
7  nevertheless dismiss the FSI because the statute is unconstitutionally vague on its
8  face, in violation of the Fifth Amendment.  Specifically, the phrase
9  "instrumentality" encourages arbitrary and discriminatory enforcement.

10  > To satisfy due process, "a penal statute [must] define the
11  > criminal offense [1] with sufficient definiteness that
12  > ordinary people can understand what conduct is
13  > prohibited and [2] in a manner that does not encourage
    > arbitrary and discriminatory enforcement.  The void-for-
14  > vagueness doctrine embraces these requirements.

15  *Skilling v. United States*, 130 S. Ct. 2896, 2927-28 (2010) (quoting *Kolender v.*
16  *Lawson*, 461 U.S. 352, 357 (1983)).   These due process requirements are most
17  exacting in the context of criminal statutes.  *Forbes v. Napolitano*, 236 F.3d 1009,
18  1011 (9th Cir. 2000).

19  The FCPA definition of "foreign official" fails this test insofar as
20  "instrumentality" cannot be precisely defined.  If "instrumentality" is not limited to
21  entities closely analogous in genesis and operation to agencies and departments (as
22  defendants' argue in Sections II.B & II.C., above), then it is difficult to imagine
23  how an ordinary person can see whether or how it is limited at all.  As a
24  consequence, the statute effectively permits the government to define, on a case-
25  by-case and arbitrary basis, what "instrumentality" means.  This is the definition of
26  unconstitutional vagueness.  Indeed, the government itself openly leaves

27
28

1    unanswered the question of what entities it might later consider to be

2    "instrumentalities" for FCPA enforcement purposes.

3          "Where the legislature fails to provide such minimal guidelines, a criminal

4    statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and

5    juries to pursue their personal predilections.'"  *Kolender*, 461 U.S. at 358 (quoting

6    *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).  Because the text of the FCPA

7    permits law enforcement to determine its sweep, enforcement of the statute

8    violates the constitutional rights to due process of LMC, Dr. Lindsey and Mr. Lee.

9    The Court should accordingly dismiss the FSI.

10         **E.     At A Minimum, The Statute Is Vague As Applied To The Conduct**

11                  **Alleged In The FSI**

12         Where statutes can be reasonably construed narrowly, courts are loath to

13   invalidate them in their entirety.  *Skilling*, 130 S. Ct. at 2928.   Instead, courts seek

14   to discern the core of conduct regulated by purportedly vague portions of statutes

15   and, if they can discern that core by reference to legislative history and case law

16   construing the statute, may uphold the statute in question rather than invalidate it

17   as a whole on constitutionality grounds.  *Id.* at 2928-30.  Hence, in *Skilling v.*

18   *United States*, the Supreme Court declined to entirely invalidate the "honest

19   services" prong of 18 U.S.C. § 1346, because it concluded that "Congress intended

20   § 1346 to reach *at least* bribes and kickbacks."  *Id.* at 2931 (emphasis in original).

21   However, as the Supreme Court recently reiterated, convictions based on

22   indictments not alleging violation of such core conduct are invalid.  *See Skilling*,

23   130 S. Ct. at 2934 (vacating conviction for conspiracy to commit "honest services

24   fraud" not based on allegations of bribery and kickbacks).

25         The Court is not presented with such an opportunity here.  In this case,

26   unlike in *Skilling,* the legislative history is sparse and no case law in existence at

27   the time of defendants' alleged conduct provided any guidance on the meaning or

28

reach of the term "instrumentality."   Nevertheless, as discussed above, the plain meaning of the term and its legislative history suggests that, at a minimum, at the core of the term are entities very similar to agencies and departments in a way that state owned corporations are not – such as branches, ministries, bureaus, and commissions of government, and that state owned corporations are outside of that core.  *See supra,* Sections II.B & II.C.  In light of this, if the Court disagrees that the statute is unconstitutionally vague on its face because it can discern that Congress meant to address at least this core with the term "instrumentality," it should nevertheless dismiss the indictment as the statute is vague as applied to the conduct alleged in the FSI.

///

///

///

///

///

///

## III.   CONCLUSION

The FCPA and its history make clear that Congress did not intend to criminalize payments to employees of state owned corporations.  "If Congress desires to go further, it must speak more clearly than it has."  *Skilling*, 130 S.Ct. at 2933 (internal citation and quotations omitted).  The government is not free to expand the reach of the statute by fiat, and the Court must enforce the limits of the statute.  For the reasons set forth herein, this Court should conclude that an employee of a state owned corporation does not qualify as a foreign official within the ambit of the FCPA or, in the alternative, that the definition of "foreign official" is unconstitutionally vague.  In either case, the Court should dismiss the First Superseding Indictment in its entirety.

DATED:  February 28, 2011         Respectfully submitted,

                                  JANET I. LEVINE
                                  CROWELL & MORING LLP

                                  /s/ Janet I. Levine
                                  By: JANET I. LEVINE
                                  Attorney for Defendant
                                  Steve K. Lee

                                  JAN L. HANDZLIK
                                  GREENBERG TRAURIG LLP

                                  /s/ Jan L. Handzlik
                                  By: JAN L. HANDZLIK
                                  Attorney for Defendants
                                  Lindsey Manufacturing Company and
                                  Keith E. Lindsey

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, at Crowell & Moring LLP at 515 S. Flower Street, 40th Floor, Los Angeles, California  90071. I am over the age of 18 and not a party to the within action.

On **February 28, 2011**, I served the foregoing document described as **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER (FILED UNDER SEPARATE COVER)** on the parties in this action by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies the following:

Douglas M. Miller (Assistant United States Attorney)
Email: doug.miller@usdoj.gov

Nicola J. Mrazek (United States Department of Justice Senior Trial Attorney)
Email: nicola.mrazek@usdoj.gov

Jeffrey Goldberg (United States Department of Justice Senior Trial Attorney)
Email: jeffrey.goldberg2@ usdoj.gov

Jan L. Handzlik (Attorney for Defendants Lindsey Manufacturing Company and Keith E. Lindsey)
Email: handzlikj@gtlaw.com
Email: godwint@gtlaw.com

Stephen G. Larson (Attorney for Defendant Angela Maria Gomez Aguilar)
Email: slarson@girardikeese.com
Email: mweber@girardikeese.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **February 28, 2011**, at Los Angeles, California.

_____/s/Kristen Savage Garcia_____
KRISTEN SAVAGE GARCIA