1  JAN L. HANDZLIK (STATE BAR NO. 47959)
   GREENBERG TRAURIG LLP
2  2450 COLORADO AVENUE, SUITE 400 EAST
   SANTA MONICA, CA 90404
3  PHONE: (310) 586-6542
   FAX: (310) 586-0542
4  EMAIL: handzlikj@gtlaw.com

5
   Attorneys for Defendants Lindsey Manufacturing
6  Company and Keith E. Lindsey

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  UNITED STATES OF AMERICA,          )  CASE NO. CR 10-1031(A)-AHM
                                       )
12                        Plaintiff,   )  **NOTICE OF MOTION; MOTION**
                                       )  **TO SUPPRESS STATEMENT OF**
13        v.                           )  **KEITH E. LINDSEY;**
                                       )  **MEMORANDUM OF POINTS AND**
14                                     )  **AUTHORITIES; DECLARATIONS**
    ENRIQUE FAUSTINO AGUILAR           )  **OF KEITH LINDSEY, LUIS COSIO,**
15  NORIEGA, ANGELA MARIA              )  **LELA LINDSEY AND JAN**
    GOMEZ AGUILAR, LINDSEY             )  **HANDZLIK; EXHIBITS;**
16                                     )  **[PROPOSED] ORDER (FILED**
    MANUFACTURING COMPANY,             )  **UNDER SEPARATE COVER)**
17  KEITH E. LINDSEY and               )
    STEVE K. LEE,                      )
18                                     )
                                       )  Date: March 21, 2011
19                       Defendants.   )  Time: 3:00 p.m.
                                       )  Place: Courtroom 14
20  _____)

21

22

23

24

25

26

27

28

          NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT
LA-129,372,450.6

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Monday, March 21, 2011 at 3:00 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable A. Howard Matz, defendant Keith E. Lindsey, by and through his counsel of record Jan Handzlik, will move this Court for an order suppressing the statement, and the fruits thereof, taken from him during the execution of a search warrant at Lindsey Manufacturing Company on November 20, 2008.

This motion is based on the accompanying Memorandum of Points and Authorities, attached declarations and exhibits, all files and records in this case, and any such arguments and evidence as may be presented at or before the hearing on this Motion.

DATED:  February 28, 2011          Respectfully submitted,

                                   JAN L. HANDZLIK
                                   GREENBERG TRAURIG LLP


                                   By: /s/ Jan L. Handzlik _____
                                   JAN L. HANDZLIK
                                   Attorney for Defendants
                                   Lindsey Manufacturing Company &
                                   Keith E. Lindsey

LA-129,372,450.6

# **TABLE OF CONTENTS**

                                                                                    **Page**

I.     BACKGROUND ................................................................................. 2

II.    ARGUMENT ...................................................................................... 6

       A.     Dr. Lindsey Was "In Custody" ............................................... 6

              1.    The FBI's raid of LMC and interrogation of Dr. Lindsey
                    involved numerous visibly armed agents. ............................... 7

              2.    Dr. Lindsey was ordered to the interrogation room. ................. 8

              3.    The FBI took extreme measures to isolate Dr. Lindsey
                    from others, including his wife and attorney .......................... 9

              4.    Dr. Lindsey was never told that he was free to leave. ........... 11

              5.    Dr. Lindsey's freedom of action was restrained by the
                    physical circumstances surrounding his interrogation. .......... 12

              6.    Dr. Lindsey was confronted with "evidence" of "guilt"
                    and pressured to incriminate himself .................................... 13

              7.    Dr. Lindsey Was Detained For An Hour. .............................. 14

       B.     The Government Interrogated Dr. Lindsey ......................... 15

III.   CONCLUSION ................................................................................ 15

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT

i

LA-129,372,450.6

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Berkemer v. McCarty,*
        486 U.S. 420 (1984)..................................................................... 6

*Miranda v. Arizona,*
        384 U.S. 436 (1966) ............................................................... 5, 9

*Oregon v. Mathiason,*
        429 U.S. 492 (1977)..................................................................... 6

*Rhode Island v. Innis,*
        446 U.S. 291 (1980)..................................................................... 15

*Sprosty v. Buchler,*
        79 F.3d 635 (7th Cir. 1996) ......................................................... 8

*United States v. Beraun –Panez,*
        812 F.2d 578 (9th Cir. 1987) ................................................... 6, 10

*United States v. Colonna,*
        511 F.3d 431 (4th Cir. 2007) ....................................................... 12

*United States v. Craighead,*
        539 F.3d 1073 (9th Cir. 2008) ............................................... passim

*United States v. Kim,*
        292 F.3d 969 (9th Cir. 2002) ................................................. passim

*United States v. Mittle-Carey,*
        493 F.3d 36 (1st Cir. 2007)........................................................... 8

*United States v. Revels,*
        510 F.3d 1269 (10th Cir. 2007) ................................................... 10

*United States v. Salabye,*
        623 F. Supp. 2d 1010 (D. Ariz. 2009) ..................................... 7, 13

LA-129,372,450.6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   BACKGROUND

Lindsey Manufacturing Company ("LMC") is a family-owned business in Azusa, California.  It designs, manufactures and sells emergency power transmission systems.  LMC markets its products both domestically and internationally through sales representatives.  Keith Lindsey, Ph.D, ("Dr. Lindsey") and his wife, Lela Lindsey ("Mrs. Lindsey"), are the company's majority shareholders.  For over the last twenty-years, Dr. Lindsey has served as the President of LMC.

On November 20, 2008, FBI agents executed a search warrant at LMC.  At approximately 6:45 a.m., at least ten armed and raid jacket-clad federal agents entered LMC.  *See* Declaration of Luis Cosio ("Cosio Dec.") at ¶ 2.  Announcing they had a search warrant, the federal agents ordered *all* employees to leave the various buildings.  *See* Cosio Dec. at ¶¶ 3, 4.

In the process of clearing the buildings, the FBI disabled LMC's telephone and Internet connections.  In doing so, one of the FBI agents told LMC's IT person "you guys don't exist today."  *See* Cosio Declaration, at ¶ 4.

Dr. Lindsey arrived at LMC approximately two hours after the search began. *See* Declaration of Dr. Lindsey ("Dr. Lindsey Dec.") at ¶ 3.  When Dr. Lindsey entered the LMC lobby, he observed more than eight armed agents conducting a search of the offices.  *See* Dr. Lindsey Dec. at ¶ 3.  One of the armed, raid-jacket clad agents stopped him immediately upon entering and demanded that Dr. Lindsey identify himself.  After learning Dr. Lindsey's identity, the agent escorted him to his office and ordered him to "stay here and do not go anywhere" because "the FBI wants to talk to you."  *See* Dr. Lindsey Dec. at ¶¶ 4-5.

LA-129,372,450.6

1    Dr. Lindsey, feeling he had no choice but to obey the agent's order, did as he
2    was told.  He remained isolated and sitting in his office for about 20 minutes.  One
3    of the agents looked in at him from time to time.  *See* Dr. Lindsey's Dec. at ¶¶ 6-7.

4    Eventually, three armed agents, all wearing similar jackets identifying
5    themselves as "FBI" or "Police," entered Dr. Lindsey's office.  They closed the
6    door behind them, causing it to lock automatically.  This door is the only way into
7    or out of Dr. Lindsey's office.  With the office door shut and his window blinds
8    drawn, Dr. Lindsey could not see out of his office.  *See* Dr. Lindsey's Dec. at ¶¶ 7-
9    8.

10   The two female agents then arranged chairs to block the only exit.  One of
11   the female agents had brought a rolling chair with her into the office, which she
12   positioned in front of the locked door and sat down facing Dr. Lindsey.  A second
13   female agent slid another chair from Dr. Lindsey's office in front of the door and
14   also sat down facing Dr. Lindsey.  The male agent sat in a chair directly across a
15   small, round table from Dr. Lindsey.  *See* Dr. Lindsey Dec. at ¶¶ 9-12; Exhibit A
16   (sketch and photo of office reflecting chair arrangement).

17   The male agent then proceeded to thoroughly interrogate Dr. Lindsey,
18   confronting him with an assortment of evidence to suggest that he had willingly
19   participated in bribing Mexican government officials.  *See* Exhibit B, FBI 302
20   Report of Interview of Keith E. Lindsey ("302 Report").  At no time was Dr.
21   Lindsey advised of his Constitutional rights, including his right to a lawyer.  When
22   Dr. Lindsey asked on occasion if he needed an attorney or said he thought he
23   should have an attorney during the questioning, his statements were ignored.  The
24   two female agents remained silent and in their chairs in front of the door,
25   continuing to stare at Dr. Lindsey throughout the questioning.  *See* Dr. Lindsey
26   Dec. at ¶¶ 13-20, 23-24.

27

28

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT

3

1    When Dr. Lindsey was unable to answer some of the male agent's questions,

2 the male agent at times used belittling and demeaning language. The agent told

3 Dr. Lindsey he wanted him to provide "definite" answers and to "be certain" in

4 answering his questions, rather than saying "I don't know" or telling the agent

5 something "might have happened" or "could have happened." When Dr. Lindsey

6 continued to respond with lack of knowledge to several questions, the male agent

7 accused him of either being "dumb" or choosing to "look the other way" and

8 demanded to know "which is it?" *See* Dr. Lindsey Dec. at ¶¶ 21, 24.

9    While Dr. Lindsey was being interrogated in isolation, his wife, Lela

10 Lindsey, a co-owner of LMC, made repeated attempts to reach him and speak with

11 him. Mrs. Lindsey wanted to find out what was happening to her husband, to

12 verify that he was okay, and to tell him he needed a lawyer before speaking with

13 the FBI. *See* Declaration of Lela Lindsey ("Mrs. Lindsey Dec.") at ¶¶ 3-8. Upon

14 being escorted out of the building by agents, Mrs. Lindsey contacted LMC's

15 employment lawyer, who immediately put her in touch with criminal counsel. *See*

16 Mrs. Lindsey Dec. at ¶¶ 9-10. Criminal counsel then attempted to reach Dr.

17 Lindsey by phone, without success, because the FBI had disabled the company's

18 phone lines. *See* Declaration of Jan Handzlik ("Handzlik Dec.") at ¶¶ 5-6.

19    On the advice of that lawyer, Mr. Lindsey then attempted to enter the LMC

20 building with Dr. Lindsey's criminal counsel on her cell phone. She told the

21 agents blocking the door to the company that she had Dr. Lindsey's lawyer on the

22 phone and wanted to have him speak with the lawyer. Despite the fact that Mrs.

23 Lindsey had previously been permitted to enter and exit the building holding a pot

24 of hot coffee in her hands, the agents blocking the door refused to let her in to

25 allow her to speak with her husband and allow his attorney to speak with him. *See*

26 Mrs. Lindsey Dec. at ¶¶ 12-13; Handzlik Dec. at ¶ 8.

27

28

1    Mrs. Lindsey was ordered out of the building and her efforts to squeeze by
2    the agents were physically blocked.  She began shouting Dr. Lindsey's name and
3    saying she had his lawyer on the phone.  After being told by the lawyer on her cell
4    phone to back off for fear of being arrested, Mrs. Lindsey left the building lobby.
5    *See* Mrs. Lindsey Dec. at ¶¶ 14-18.  She then went to a location outside Dr.
6    Lindsey's office window, where she proceeded to throw bark from the bed of
7    bushes in front of the window at the window.  She continued to call out her
8    husband's name, but got no response.  *See* Mrs. Lindsey Dec. at ¶¶ 19-20.

9    At the same time, Mrs. Lindsey gave Dr, Lindsey's cell phone number to his
10    criminal counsel.  The lawyer then called Dr. Lindsey on his cell phone and
11    reached Dr. Lindsey, who placed the call on the speaker of his cell phone.  *See*
12    Handzlik Dec. at ¶¶ 11-13.  Counsel then spoke with the male agent and told the
13    agent to discontinue speaking with and questioning Dr. Lindsey.  The agent agreed
14    and the phone conversation ended shortly thereafter, but Dr. Lindsey mistakenly
15    forgot to hang up his cell phone.  *See* Dr. Lindsey Dec. at ¶¶ 25-26; Handzlik Dec.
16    at ¶¶ 13-14.

17    Although it was apparent that the male agent thought Dr. Lindsey had
18    terminated the cell phone call, the agent continued to speak with Dr. Lindsey
19    without regard to his counsel's request, instructing him to tell his lawyer how Dr.
20    Lindsey should answer FBI's questions ("be definite" in your answers and "be
21    certain" about your answers, rather than saying "'maybe something happened,'"
22    etc.).  *See* Dr. Lindsey Dec. at ¶ 28; Handzlik Dec. at ¶ 15.  Dr. Lindsey did not
23    respond these statements and was eventually escorted out of the LMC building.
24    *See* Dr. Lindsey Dec. at ¶¶ 28-29.

25    Despite the fact that Dr. Lindsey was clearly in the custody of the agents
26    when interrogated, he never received *Miranda* warnings – or any warnings
27    whatsoever.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  The agents ignored his

28

*LA-129,372,450.6*

1   questions about having a lawyer and statement that he thought he should have a
2   lawyer during the questioning.   Among other things, the fact that the company's
3   phone lines had been disabled and his wife and co-owner of the company was
4   denied access to Dr. Lindsey (both to see if he was okay and to enable him to
5   confer with his lawyer) are further indicia of the fact that Dr. Lindsey was clearly
6   in custody.   Dr. Lindsey's statement was taken in violation of *Miranda* and must
7   be suppressed.

8   **II.   ARGUMENT**

9       *Miranda* warnings must be given in "custodial interrogations." *Oregon v.*
10  *Mathiason*, 429 U.S. 492, 495 (1977).   Statements that are the product of
11  "custodial interrogations" are "inadmissible" when "not preceded by" *Miranda*
12  warnings. *United States v. Beraun –Panez,* 812 F.2d 578, 580 (9th Cir. 1987).
13  The applicable facts and law clearly demonstrate that Dr. Lindsey was
14  "interrogated" while "in custody," but never advised of his *Miranda* rights.

15      **A.   Dr. Lindsey Was "In Custody"**

16      A suspect not formally taken into police custody "is nevertheless considered
17  'in custody' for purposes of *Miranda* if the suspect has been deprived of his
18  freedom of action in any significant way." *United States v. Craighead*, 539 F.3d
19  1073, 1082 (9th Cir. 2008).   To assess whether a person is in "custody" Courts
20  consider "the totality of the circumstances surrounding the interrogation." *Id.* The
21  ultimate issue is "whether a reasonable person in those circumstances would 'have
22  felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.*
23  (quoting  *Berkemer v. McCarty*, 486 U.S. 420, 442 & n.35 (1984)).

24      Courts use the "police-dominated atmosphere" approach "as the benchmark
25  for custodial interrogations in locations outside of the police station." *Id.* at 1083.
26  This is a "fact intensive" inquiry that considers such factors as (1) the number of
27  law enforcement personnel and whether they were armed; (2) the language used to

28
                    NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT
                                          6

1   summon the individual; (3) whether the suspect was isolated from others; (4)

2   whether the suspect was informed that he was free to leave or terminate the

3   interview, and the context in which any such statements were made; (5) whether

4   the suspect's freedom of movement was restrained; (6) the extent to which the

5   defendant is confronted with evidence of guilt; and (7) the duration of the

6   detention. *Compare United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002)

7   (evaluating whether interrogation at suspect's place of business was custodial);

8   *with United States v. Craighead*, 539 F.3d at 1084 (evaluating whether

9   interrogation at suspect's home was custodial) *and United States v. Salabye*, 623 F.

10  Supp. 2d 1010, 1013 (D. Ariz. 2009) (same).

11          Here, all of the relevant factors point strongly toward a finding that Dr.

12  Lindsey was interrogated while in "custody."

### 1. The FBI's raid of LMC and interrogation of Dr. Lindsey involved numerous visibly armed agents.

15          "[T]he presence of a large number of visibly armed law enforcement officers

16  goes a long way towards making the suspect's home a police-dominated

17  atmosphere." *Craighead*, 539 F.3d at 1085.

18          Here, on the morning of November 20, 2008, LMC was raided by up to 19

19  armed FBI agents.  The agents arrived prepared for confrontation, armed and

20  wearing raid jackets.  When Dr. Lindsey entered LMC, he saw more than eight

21  armed agents in the midst of their search.  He was immediately sequestered in his

22  office and ordered to remain there and "not go anywhere," because "the FBI wants

23  to talk to you."  Thereafter, he was interrogated by three armed agents in seclusion

24  behind a closed, locked door.

25          Case law makes clear that such circumstances strongly suggest a "police-

26  dominated atmosphere." *See, e.g., Craighead*, 539 F.3d at 1085 (finding that

27  presence of eight armed law enforcement officers in suspect's home would lead a

28

1  reasonable person to "feel that his home was dominated by law enforcement agents

2  and that they had come prepared for a confrontation"); *United States v. Mittle-*

3  *Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding that presence of eight officers in

4  the home contributed to police-dominated environment); *Sprosty v. Buchler*, 79

5  F.3d 635, 641 (7th Cir. 1996) (five officers, one of whom was visibly armed and in

6  uniform, who surrounded the suspect in two police cars, supported finding of

7  custody).

8            **2.**      **Dr. Lindsey was ordered to the interrogation room.**

9        In determining whether a suspect was "in custody" for *Miranda* purposes,

10  Courts consider "whether [the suspect] voluntarily approached or accompanied law

11  officers *understanding that questioning would ensue*."  *United States v. Kim*, 292

12  F.3d 969, 974 (9th Cir. 2002) (emphasis in original).  "There is a critical

13  distinction, however, between voluntarily entering one's own place of business

14  without any intention to present oneself for a police interview, and voluntarily

15  accompanying the police to their station upon request for the very purpose, known

16  in advance, of answering their questions."  *Id.*

17        Here, Dr. Lindsey did not willingly agree to submit to an encounter with FBI

18  agents for purposes of an interview.  Rather, Dr. Lindsey went to LMC on

19  November 20, 2008, as he had daily for over the last twenty-five years to work.

20  While he arrived at work voluntarily, he did not do so for the purpose of speaking

21  with FBI agents or subjecting himself to an interrogation.  *See Kim*, 292 F.3d at

22  974-75 (holding that suspect's act of voluntarily driving to work and voluntarily

23  entering building during FBI search did not establish that she willingly agreed to

24  be questioned by police, and was "entirely uninformative in determining the

25  dispositive question – whether [she] would have felt free to leave once the

26  questioning started").

27        Upon entering work, Dr. Lindsey was immediately approached by an armed

28  agent, ordered to identify himself, escorted to his isolated office, and expressly

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT

8

*LA-129,372,450.6*

1   ordered to "stay here and do not go anywhere." He was given no options other

2   than to comply. *See Kim*, 292 F.3d at 974-75 (holding that suspect who voluntarily

3   came to work during police raid was, nevertheless, "in custody" when she was

4   subsequently "ordered to shut up, seated in isolation away from others, and then

5   questioned.")

### 3.  The FBI took extreme measures to isolate Dr. Lindsey from others, including his wife and attorney.

8       "[I]solation from the outside world" is "perhaps the crucial factor that would

9   tend to lead a suspect to feel compelled to provide self-incriminating statements."

10  *Craighead*, 539 F.3d at 1086-87.  As the Ninth Circuit noted, "[a] frequently

11  recurring example of police domination concerns the removal of the suspect from

12  the presence of family, friends, or colleagues who might lend moral support during

13  the questioning and deter a suspect from making inculpatory statements." *Id.* at

14  1087.  Accordingly, "the law enforcement technique of isolating the suspect from

15  family and friends is one of the distinguishing features of a custodial

16  interrogation." *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 445-46, 448-50

17  (1966).

18      Here, the FBI took extreme measures to isolate Dr. Lindsey from the outside

19  world.  They escorted him to his office, leaving him isolated and away from his

20  coworkers and wife.  The interrogation took place behind a locked door with

21  window blinds drawn.  The FBI disabled LMC's phone system, thereby thwarting

22  his attorney's efforts to reach him during the interrogation.   When Dr. Lindsey's

23  wife attempted to enter LMC for the stated purpose of delivering Dr. Lindsey her

24  phone with his attorney on the line, she was blocked and ordered not to go inside.

25  When she persisted, an agent physically restrained her from entering by blocking

26  her with his body as she attempted to squeeze by.  The FBI agents apparently made

27

28

LA-129,372,450.6

1    no effort during this interrogation to inform Dr. Lindsey that his wife and attorney

2    were attempting to reach him.

3        Case law makes clear that such circumstances establish sufficient police

4    dominion or control over the environment to render Dr. Lindsey's interrogation

5    "custodial." *See Craighead*, 539 F.3d at 1087 (finding suspect was "in custody"

6    where agents did not permit colleague to accompany suspect to room where

7    interrogation took place and did not inform the suspect that his colleague was on

8    the premises); *Kim*, 292 F.3d at 971-72 (finding suspect was "in custody" at place

9    of work when officers locked husband outside and prevented her son from

10    communicating with her); *United States v. Beraun-Panez*, 812 F.2d 578, 580

11    (1987) (finding that by intercepting and turning-away a co-worker who approached

12    the place of interrogation, "the officers asserted their dominion over the

13    interrogation site and eliminated any last vestige of a public interrogation"); *see*

14    *also United States v. Revels*, 510 F.3d 1269 (10th Cir. 2007) (officers' acts of

15    separating suspect from boyfriend and children, escorting her to a rear bedroom in

16    her house for questioning, and then interrogating her behind a closed door,

17    "demonstrate[d] that the police were unequivocally in control of the circumstances

18    both before and during [the suspect's] questioning").

19        In short, the agents' acts of isolating Dr. Lindsey in a secluded office for

20    questioning -- and affirmatively blocking access to his wife, attorney and the rest

21    of the outside world throughout his interrogation -- transformed his workplace

22    from an otherwise familiar location into a "police-dominated atmosphere" in which

23    Dr. Lindsey did not feel free to leave. *See Craighead*, 539 F.3d at 1087 ("[T]he

24    fact that the FBI excluded non-law enforcement reinforces our understanding that

25    the FBI controlled [the suspect's] environment; it is difficult to see how [the

26    suspect] was free to leave if he was, apparently, not free to invite others into the

27    storage room of his own house."); *Kim*, 292 F.3d at 974-75 ("[I]solating the

28

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT

10

*LA-129,372,450.6*

1   defendant from the outside world – [including] her husband who had tried to join

2   her in the shop – largely neutralizes the familiarity of the location.").

3             **4. Dr. Lindsey was never told that he was free to leave.**

4         "If a law enforcement officer informs the suspect that he is not under arrest,

5   that statements are voluntary, and that he is free to leave at any time, this

6   communication greatly reduces the chance that a suspect will reasonably believe he

7   is in custody." *See Craighead*, 539 F.3d at 1087.  The "mere recitation of" such

8   statements, however, "does not render an interrogation non-custodial *per se.*"  *Id.*

9   The Court must "consider the delivery of these statements within the context of the

10  scene as a whole." *Id.* at 1088.

11        Here, Dr. Lindsey was never informed that he was free to leave.  To the

12  contrary, the agent who escorted him to his office, explicitly ordered him to "stay

13  here and do not go anywhere; the FBI wants to talk to you."  The agents also did

14  not assure Dr. Lindsey that he was not under arrest. *See* Dr. Lindsey Dec. at ¶¶ 14-

15  15.

16        The agents' interview report asserts that agents did inform Dr. Lindsey that

17  the interview was voluntary and could be terminated at any time.  If such

18  statements were in fact made, the circumstances and surroundings in which they

19  may have been made, and the conduct of the officers immediately prior to making

20  these purported statements, undermined their effect.  The agents relayed this

21  information only after closing and locking the office door, rearranging furniture so

22  as to block Dr. Lindsey's only path of exit, and seating two armed agents in front

23  of the door.  Such conduct by the agents rendered the subsequent representations

24  about the voluntariness of the interview blatantly insincere.  *Craighead*, 539 F.3d

25  at 1088-89 (holding that interrogation was custodial despite agent's statement that

26  suspect was "free to leave," because such statements were made in an isolated

27  storage room with an armed detective wearing a raid vest standing in front of the

28

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT
11

*LA-129,372,450.6*

1  only exit); *see also United States v. Colonna,* 511 F.3d 431, 435 (4th Cir. 2007)

2  (finding "custodial interrogation" where agents informed suspect he was "not

3  under arrest," but did not inform him that he was "free to leave").

### 5. <u>Dr. Lindsey's freedom of action was restrained by the physical circumstances surrounding his interrogation.</u>

6  "When law enforcement agents restrain the ability of the suspect to move . .

7  .a suspect may reasonably feel he is subject to police domination . . . and thus not

8  free to leave or terminate the interrogation." *Craighead,* 539 F.3d at 1085.

9  Importantly, the Ninth Circuit has found "restraint" to exist even when the suspect

10  is not handcuffed or touched by the agents.

11  In *Craighead,* the suspect was not handcuffed or physically restrained in any

12  way. *Id.* at 1086. However, he was escorted to a back storage room and the door

13  was closed behind him. A visibly armed detective wearing a "raid vest" was then

14  placed in front of the closed door. The detective in front of the door did not

15  participate in the interrogation by asking questions; he stood silent with his back to

16  the door facing the suspect. *Id.* The Ninth Circuit concluded that such a setting

17  was sufficient to restrain the suspect freedom of action:

> While perhaps not everyone in this circumstance would
> have felt restrained, it was certainly objectively
> reasonable for [the suspect] to believe he was under
> guard. When viewed in their totality, these facts
> demonstrate that [the suspect's] freedom of action was
> restrained in a way that increased the likelihood that [the
> suspect] would succumb to police pressure to incriminate
> himself.

26  *Id.*

LA-129,372,450.6

The circumstances surrounding Dr. Lindsey's interrogation present an even greater showing of restraint than those addressed by the Ninth Circuit in *Craighead*. Like the suspect in *Craighead*, Dr. Lindsey was escorted to an isolated room for questioning and ordered to "not go anywhere," because the "FBI wants to talk to you." Dr. Lindsey did as he was told, believing he was not free to leave. Thereafter, three agents entered the room and closed and locked the door, before commencing the interrogation. Moreover, the agents rearranged chairs in the office to block Dr. Lindsey's pathway to the door. Two visibly armed agents, wearing raid jackets then seated themselves in these chairs. These two agents sat silently with their backs to the door facing Dr. Lindsey staring at him while a third agent questioned him for about 30 minutes.

Any reasonable person in such a situation would have felt restrained from leaving. *See Kim,* 292 F.3d at 972 (noting that, even though officers did not handcuff the suspect at any point, at least two officers sat and stood around her in such a way that the suspect reasonably felt surrounded by them); *United States v. Salabye*, 623 F. Supp. 2d 1010, 1013 (D. Ariz. 2009) (holding that, although the suspect "was not restrained by force, threats, or handcuffs," the "environment" surrounding his interrogation "amounted to law enforcement containment and control of Defendant").

### 6. Dr. Lindsey was confronted with "evidence" of "guilt" and pressured to incriminate himself.

In evaluating whether an interrogation is "in custody," courts also consider "the extent to which the defendant is confronted with evidence of guilt." *Kim,* 292 F.3d at 974 (finding fact that questioning "covered in detail" the suspected criminal activity "could only have reinforced" the impression that the defendant was a criminal suspect).

Here, Dr. Lindsey was questioned in detail about (1) his relationships with the Mexican officials allegedly receiving bribe payments, (2) his relationship with

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT

13

LA-129,372,450.6

1  the sales agent who purportedly made the bribes, and (3) his knowledge about the

2  specific bribe payments at issue in this case.  He was also confronted with evidence

3  that LMC paid commissions to its Mexican sales agent shortly before the sales

4  agent made purported bribe payments to government officials in similar amounts.

5  *See* Exhibit B (302 Report).  Dr. Lindsey was indisputably confronted with

6  evidence of guilt, so much so that it prompted him to inquire about speaking with

7  an attorney.

8         The interrogating agent was also hostile in his questioning.  When Dr.

9  Lindsey professed lack of knowledge and uncertainty about the purported bribe

10  payments, the questioning agent grew angry and demanded that he be "positive" in

11  his responses and refrain from saying "I don't know" or "maybe."  When Dr.

12  Lindsey continued to profess uncertainty about the evidence against him, the agent

13  accused him of either being "stupid" or consciously choosing "to look the other

14  way."   Dr. Lindsey was undeniably questioned in a manner designed to elicit

15  incriminating responses.

16          **7.      Dr. Lindsey Was Detained For An Hour.**

17         The longer a suspect is detained and interrogated, the more likely he was "in

18  custody."  While there is no magic number, in *Kim* the Ninth Circuit found that the

19  defendant was "in custody," when she was detained  for "some time" before

20  questioning began, then questioned 30 minutes before an interpreter arrived and for

21  another 20 minutes with the interpreter. 292 F.3d at 977.

22         Like *Kim*, Dr. Lindsey was isolated and detained for perhaps 20 minutes

23  before being interrogated.  He was then questioned for up to 30 minutes.  The exact

24  length of the questioning is unknown, since the agents failed to note the duration of

25  the interview in their notes.  However, the agents managed to cover essentially all

26  of the alleged misconduct, suggesting that this was a full interrogation.

27

28

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT
14

## B.    The Government Interrogated Dr. Lindsey

It is beyond reasonable dispute that Dr. Lindsey was interrogated by the FBI agents.  Interrogation is defined as "express questioning" or any activity by law enforcement officers "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  An "incriminating response" refers to "any response – whether inculpatory or exculpatory – that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5 (emphasis in original).

Here, the federal agents asked Dr. Lindsey direct questions regarding the substance of the crimes he was later charged with in the First Superseding Indictment.  *Compare* Exhibit B (302 Report) *with* Exhibit C, First Superseding Indictment, pp. 6-17.  It is also clear that, from the first moment Dr. Lindsey arrived at LMC, the federal agents' intended to question him.  Indeed, upon his entering the building, an agent immediately led him to his private office and ordered him to remain there for questioning.  The agents' direct questioning and intent make clear that Dr. Lindsey was interrogated.

## III.    <u>CONCLUSION</u>

The circumstances establish Dr. Lindsey was interrogated while in custody. He was not given *Miranda* warnings.  His statement, and the fruits thereof, must be suppressed.

DATED:  February 28, 2011          Respectfully submitted,

JAN L. HANDZLIK
GREENBERG TRAURIG LLP

_/s/ Jan L. Handzlik per email authorization_
By:  JAN L. HANDZLIK
Attorney for Defendants
Lindsey Manufacturing Company &
Keith E. Lindsey

NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENT
15

LA-129,372,450.6