# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

EXHIBIT A

# LINDSEY
## GENERAL COMPUTATION SHEET

SUBJECT KEITH LINDSEY'S OFFICE        PAGE NO.

DATE _____  FILE NO. _____

MADE BY _____  APPROVED BY _____

SHEETS





# EXHIBIT B

# EXHIBIT B

# EXHIBIT B

EXHIBIT B

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/03/2008

KEITH EDWARD LINDSEY (KEITH), ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮, was interviewed at his place of
employment, LINDSEY MANUFACTURING, 760 N. Georgia Avenue, Azusa,
California 91702.  After being advised of the identities of the
interviewing agents and the nature of the interview, KEITH was
advised that he did not need to speak with the interviewing agents
and that his interview was voluntary.  KEITH was further advised
that he could terminate the interview at any time.  KEITH advised
that he understood and wanted to speak with the interviewing
agents.  KEITH then provided the following information:

KEITH met NESTOR MORENO (MORENO) twice in approximately
the year 2000, when MORENO was the manager of CFE.  Both times, the
meetings occurred in Mexico at the CFE offices.  KEITH could not
recall having seen MORENO since then.

KEITH did not think LINDSEY MANUFACTURING (LINDSEY) had a
present contract with CFE, but was probably still honoring some of
the terms of previous contracts.  LINDSEY has had several contracts
over the years with CFE.  KEITH recalled that the first contract
between LINDSEY and CFE was around 1994.  LINDSEY's business with
CFE was regarding emergency restoration and voltage monitoring
systems.

ENRIQUE AGUILAR (AGUILAR) is LINDSEY's representative in
Mexico.  AGUILAR introduced himself to LINDSEY at LINDSEY's offices
in Azusa, CA.  AGUILAR used to be a representative in Mexico for
LINDSEY's main competitor, SBB INTERNATIONAL (SBB), based in
Quebec, Canada.  KEITH believed AGUILAR must have had some sort of
falling out with SBB, so he came to LINDSEY to offer his services
as LINDSEY's representative in Mexico.

Around the year 2000, LINDSEY and SBB placed contract
bids with CFE.  Although LINDSEY's bid was lower than SBB's bid,
SBB won the contract.  KEITH assumed SBB had paid someone to get
the contract with CFE, although he did not know this for a fact.
During the time that AGUILAR represented SBB, SBB routinely beat
LINDSEY out for CFE contracts. KEITH assumed that SBB paid AGUILAR
a commission.

Investigation on   11/20/2008   at   Azusa, California

File # ▮▮▮▮▮▮▮▮▮▮▮▮▮                          Date dictated _____

by   SA Susan Guernsey/sg
     SA Farrell A. Binder, SSA Carlos Narro

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

Lindsey_DOJ_022962

FD-302a (Rev. 10-6-95)

████████████

Continuation of FD-302 of _____KEITH  EDWARD  LINDSEY_____ , On 11/20/2008 , Page __2__

AGUILAR came to LINDSEY's offices for the first time in
the early 2000s, and offered to be LINDSEY's representative in
Mexico.  AGUILAR said he would get LINDSEY an order from CFE, and
he did.  After AGUILAR produced an order from CFE, LINDSEY agreed
to hire AGUILAR as their representative.

Once AGUILAR became LINDSEY's representative with CFE,
some contracts were automatically awarded to LINDSEY without going
through the bid process, and others went through the bid process
before ultimately being awarded to LINDSEY.

Since AGUILAR has been LINDSEY's representative, payments
have never been made directly between CFE and LINDSEY.  All
payments go through AGUILAR, who receives a healthy commission of
30% for all CFE contracts.  All requests for LINDSEY's pricing
regarding CFE contracts came from AGUILAR, or someone in his
office.  LINDSEY would prepare the pricing, and send it back to
AGUILAR.  KEITH was unsure what AGUILAR did with the pricing after
that.

Prior to AGUILAR becoming LINDSEY's representative,
LINDSEY would have shipments going into Mexico held up at the
Mexican border.  The Mexican border agents would want a bribe to
allow the shipment to continue on.  LINDSEY told AGUILAR about the
problems LINDSEY's shipments were having at the border.  AGUILAR
told LINDSEY he also had a separate freight company that handled
all shipments into Mexico for CFE, so LINDSEY started using
AGUILAR's freight company for shipment.  There have been no
problems with LINDSEY shipments at the border since they started
using AGUILAR's company.  LINDSEY pays AGUILAR's freight company
separately for these shipments. KEITH could not recall the name of
AGUILAR's freight company.

There should be some type of representation contract in
LINDSEY's representation commission file for the relationship
between AGUILAR and LINDSEY.  STEVE LEE (LEE) and KEITH drew up the
contract for AGUILAR's 30% commission.  The meeting agreeing to
AGUILAR's representation of LINDSEY in Mexico happened sometime in
the early 2000s at the LINDSEY offices.

KEITH stated that the typical commission domestically
tops out at approximately 15%, but internationally it tends to be a
little higher, approximately between 17% and 20%.  KEITH initially
could not recall other reps, besides AGUILAR that made
approximately 30% commission.  KEITH later recalled that there was

**Lindsey_DOJ_022963**

FD-302a (Rev. 10-6-95)

▮▮▮▮▮▮▮▮▮▮

Continuation of FD-302 of _____KEITH EDWARD LINDSEY_____ , On __11/20/2008__ , Page ___3___

one sales rep, in the Philippines, who was getting around 20% commission.

To the best of KEITH's recollection, AGUILAR only represented CFE in Mexico. KEITH recalled AGUILAR basically saying, "give me 30% commission and I'll get you CFE." AGUILAR said he could get orders from CFE for LINDSEY. KEITH assumed AGUILAR had high-powered friends which he used get the contracts. KEITH purposely did not ask. AGUILAR said he had a close relationship with MORENO. LINDSEY thought AGUILAR might have mentioned that he and MORENO were neighbors.

KEITH admitted that AGUILAR's commission was high. KEITH did not want to ask what AGUILAR did with the commissions that LINDSEY paid. AGUILAR had acknowledged that his commission was a little high. KEITH had suspicions that money from AGUILAR's commission was possibly being passed on to someone at CFE, possibly MORENO, to obtain the contracts, but he never asked AGUILAR. Although KEITH assumed that part of the commission was to pay someone at CFE, KEITH did not want to know. KEITH never heard anything from AGUILAR regarding whether AGUILAR was paying MORENO money or buying him things. However, KEITH was not surprised to hear that AGUILAR bought MORENO a Ferrari.

[KEITH asked if he needed an attorney. Upon being advised by the interviewing agents that he could obtain an attorney if he wished and that the interview was strictly voluntary, KEITH stated that he wanted to voluntarily continue with the interview. Upon being advised that he could terminate the interview at any time, KEITH stated that he understood, and wanted to voluntarily continue with the interview.]

KEITH believed LINDSEY was only paying money to AGUILAR for the CFE contracts, and also paying money to AGUILAR's freight company for handling the shipments to Mexico. LINDSEY never paid AGUILAR his commission on a specific contract until LINDSEY was paid by CFE. A representative is only paid his/her commission once the contract is paid.

LEE is the Vice President of Finance and General Manager of LINDSEY. LEE had authorization to make wire transfers on behalf of LINDSEY during the time of the CFE contracts. LEE is still currently authorized to make wire transfers. However, all checks must have two signatures. KEITH usually approved all checks.

**Lindsey_DOJ_022964**

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____KEITH EDWARD LINDSEY_____ , On _11/20/2008_ , Page ___4___

     AGUILAR did not care for the Director of Marketing at LINDSEY, PHIL LAST NAME UNKNOWN(LNU), so he usually did business with LEE. AGUILAR and LEE talked about the payments and wire transfers. KEITH was not involved in these discussions. Sometimes, a representative for AGUILAR would ask LINDSEY to send money to specific places.

     AGUILAR usually came to the LINDSEY offices in Azusa to meet with regards to CFE contracts. AGUILAR has probably been to LINDSEY about a half a dozen times. AGUILAR met with LINDSEY once in San Diego, while LINDSEY was participating in a trade show in San Diego. KEITH definitely remembered that AGUILAR came to the LINDSEY offices in 2006, because there was an extremely large order LINDSEY was processing for CFE.

     AGUILAR often communicated through e-mail, and KEITH remembered those communications coming through AGUILAR's wife's e-mail account. KEITH did not recall AGUILAR's wife's name, or the e-mail address.

     CFE always paid LINDSEY promptly, once AGUILAR became LINDSEY's representative. KEITH thought it was because AGUILAR's commission payment depended upon CFE's payment to LINDSEY.

     KEITH last talked to AGUILAR approximately one to two years ago, and remembered AGUILAR last being at the LINDSEY offices one to one and half years ago.

     KEITH was not familiar with the names SORVILL or MAQUINARIA UNIDA.

     [At approximately 10:30 a.m., KEITH LINDSEY's attorney, JAN HANDZLIK, telephoned KEITH. HANDZLIK asked to speak to one of the interviewing agents and he then spoke to SSA Carlos A. Narro. SSA Narro advised HANDZLIK that KEITH had been voluntarily cooperating with the interviewing agents, after which HANDZLIK requested that no more questions be asked of KEITH until he spoke with HANDZLIK. SSA Narro than advised HANDZLIK that the interview would be terminated. No further questions were asked of KEITH. KEITH indicated that he wanted to continue even though his attorney asked that the interview be terminated and the agents advised that they would comply with HANDZLIK's request.]

**Lindsey_DOJ_022965**

# EXHIBIT C

# EXHIBIT C

# EXHIBIT C

EXHIBIT C

FILED

2010 OCT 21  PM 2:15

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2010 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 10-1031(A)-AHM |
| Plaintiff, | ) ) ) | F I R S T S U P E R S E D I N G I N D I C T M E N T |
| v. | ) ) ) | |
| ENRIQUE FAUSTINO AGUILAR NORIEGA, ANGELA MARIA GOMEZ AGUILAR, aka "Angela Maria Gomez Aguilar," aka "Angela Maria Cepeda Gomez Aguilar," aka "Angela Gomez Cepeda," LINDSEY MANUFACTURING COMPANY, KEITH E. LINDSEY, and STEVE K. LEE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | [18 U.S.C. § 371: Conspiracy; 15 U.S.C. § 78dd-2: Foreign Corrupt Practices Act; 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments; 18 U.S.C. § 1956(a)(1)(B)(i): Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing Acts To Be Done; 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c): Criminal Forfeiture; 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853: Criminal Forfeiture] |
| Defendants. | ) ) ) ) ) | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

A.    RELEVANT STATUTES

1.    The Foreign Corrupt Practices Act of 1977 ("FCPA"), as

DMM:dmm
NJM:njm

1  amended, Title 15, United States Code, Sections 78dd-2, *et seq.*,

2  was enacted by Congress for the purpose of, among other things,

3  making it unlawful for certain persons and business entities

4  defined as "domestic concerns," or officers, employees, or agents

5  of those domestic concerns, to act corruptly in furtherance of an

6  offer, promise, authorization, or payment of money or anything of

7  value to a foreign government official for the purpose of

8  obtaining or retaining business for or with, or directing

9  business to, any person.

10      2.    Article 222 of the Federal Penal Code of the United

11  Mexican States ("Mexico") prohibited a public servant from

12  soliciting or receiving money or gifts for himself or another, or

13  accepting a promise, in exchange for an act or omission, whether

14  lawful or unlawful, in relation to his public duties.  Article

15  222 also prohibited any person from giving or offering money or

16  gifts in order for any public servant to commit an act or

17  omission, whether lawful or unlawful, in relation to his public

18  duties.

19  B.    RELEVANT PERSONS AND ENTITIES

20      3.    Comisión Federal de Electricidad ("CFE") was an

21  electric utility company owned by the government of Mexico.

22  During the time period relevant to this Indictment, CFE was

23  responsible for supplying electricity to all of Mexico other than

24  Mexico City.  CFE contracted with Mexican and foreign companies

25  for goods and services to help supply electricity services to its

26  customers.

27      4.    Official 1 was a Mexican citizen who held a senior

28  level position at CFE.  Official 1 became the Sub-Director of

-2-

Generation for CFE in 2002 and the Director of Operations in 2007. Official 1's position at CFE made him a "foreign official," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

5. Official 2 was a Mexican citizen who also held a senior level position at CFE. Official 2 was the Director of Operations at CFE until that position was taken over by Official 1 in 2007. Official 2's position at CFE made him a "foreign official," as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(2).

6. Defendant LINDSEY MANUFACTURING COMPANY ("LINDSEY MANUFACTURING") was a privately held company incorporated in California and headquartered in Azusa, California. As such, defendant LINDSEY MANUFACTURING was a "domestic concern" as that term is defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1). Defendant LINDSEY MANUFACTURING manufactured emergency restoration systems ("ERSs") and other equipment that was used by electrical utility companies. Defendant LINDSEY MANUFACTURING maintained several bank accounts at U.S. banks, including Preferred Bank and United Bank. Many of defendant LINDSEY MANUFACTURING's clients were foreign, state-owned utilities, including CFE, which was one of defendant LINDSEY MANUFACTURING's most significant customers. Defendant LINDSEY MANUFACTURING conducted business in a number of its foreign markets through sales representatives.

7. Defendant KEITH E. LINDSEY ("LINDSEY") was the President of defendant LINDSEY MANUFACTURING. In that position, defendant LINDSEY had ultimate authority over all of defendant LINDSEY MANUFACTURING's operations. Defendant LINDSEY also had a majority ownership interest in defendant LINDSEY MANUFACTURING

-3-

1  and was signatory authority over defendant LINDSEY

2  MANUFACTURING's bank accounts.  Defendant LINDSEY was a citizen

3  of the United States.  In light of the foregoing, defendant

4  LINDSEY was a "domestic concern" and an officer, employee, and

5  agent of a domestic concern, as those terms are defined in the

6  FCPA, 15 U.S.C. § 78dd-2(h)(1).

7       8.    Defendant STEVE K. LEE ("LEE") was the Vice President

8  and Chief Financial Officer of defendant LINDSEY MANUFACTURING.

9  In that position, defendant LEE controlled defendant LINDSEY

10  MANUFACTURING's finances and had signatory authority over

11  defendant LINDSEY MANUFACTURING's bank accounts.  Defendant Lee

12  was also a citizen of the United States.  In light of the

13  foregoing, defendant LEE was a "domestic concern" and an officer,

14  employee, and agent of a domestic concern, as those terms are

15  defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

16       9.    Grupo Internacional De Asesores S.A. ("Grupo") was a

17  company incorporated in Panama and headquartered in Mexico.

18  Grupo maintained a brokerage account in Houston, Texas, at Global

19  Financial Services, Inc. ("Global Financial").  Grupo's purported

20  business was to provide sales representation services for

21  companies like defendant LINDSEY MANUFACTURING that had business

22  with CFE.  Grupo was defendant LINDSEY MANUFACTURING's sales

23  representative in Mexico and received a percentage of the revenue

24  defendant LINDSEY MANUFACTURING received from its contracts with

25  CFE.  Defendant LINDSEY MANUFACTURING obtained multiple contracts

26  with CFE while using Grupo as its sales representative.  In light

27  of the foregoing, Grupo was an agent of a domestic concern, as

28  those terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

-4-

10.   Defendant ENRIQUE FAUSTINO AGUILAR NORIEGA ("ENRIQUE AGUILAR") was born in Mexico and was a lawful permanent resident of the United States.  Defendant ENRIQUE AGUILAR was a Director of Grupo and was hired by defendant LINDSEY MANUFACTURING to obtain contracts from CFE.  In light of the foregoing, defendant ENRIQUE AGUILAR was a "domestic concern" and an agent of a domestic concern, as those terms are defined in the FCPA, 15 U.S.C. § 78dd-2(h)(1).

11.   Defendant ANGELA MARIA GOMEZ AGUILAR, also known as ("aka") "Angela Maria Gomez Aguilar," "Angela Maria Cepeda Gomez Aguilar," "Angela Gomez Cepeda" ("ANGELA AGUILAR"), was a citizen of Mexico and was married to defendant ENRIQUE AGUILAR. Defendant ANGELA AGUILAR served as an Officer and a Director of Grupo.  In that position, defendant ANGELA AGUILAR managed Grupo's finances and was the sole signatory on Grupo's Global Financial brokerage account.

12.   Sorvill International S.A. ("Sorvill") was a company incorporated in Panama and headquartered in Mexico.  Sorvill maintained bank accounts in Germany and Switzerland.  Like Grupo, Sorvill's purported business was to provide sales representation for companies that had business with CFE.  Defendant ENRIQUE AGUILAR was also the Director of Sorvill, and defendants ENRIQUE AGUILAR and ANGELA AGUILAR both had signatory authority over Sorvill's bank accounts.

//
//

COUNT ONE

[18 U.S.C. § 371]

1.   The Grand Jury incorporates and realleges the allegations contained in paragraphs 1 through 12 in the Introductory Allegations above as though fully set forth in their entirety here.

A.   THE OBJECT OF THE CONSPIRACY

2.   Beginning in or around February 2002, and continuing through in or around March 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, and LEE, together with co-conspirator Grupo, and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offense against the United States:

To willfully make use of mails and means and instrumentalities of interstate commerce, corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official and any person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to any foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities

-6-

1  thereof to affect and influence acts and decisions of such

2  government and instrumentalities, in order to assist defendants

3  ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, and LEE,

4  coconspirator Grupo, and others in obtaining and retaining

5  business for and with, and directing business to, defendant

6  LINDSEY MANUFACTURING, in violation of Title 15, United States

7  Code, Sections 78dd-2(a).

8  B.    THE MANNER AND MEANS OF THE CONSPIRACY

9         3.    The object of the conspiracy was carried out, and was

10  to be carried out, in substance, as follows:

11              a.    Defendants LINDSEY MANUFACTURING, LINDSEY and LEE

12  would retain defendant ENRIQUE AGUILAR as defendant LINDSEY

13  MANUFACTURING's sales representative in Mexico because of his

14  close personal relationship with and influence over Official 1.

15              b.    Defendants LINDSEY MANUFACTURING, LINDSEY and LEE

16  would agree to pay defendant ENRIQUE AGUILAR a thirty percent

17  commission on all of the goods and services defendant LINDSEY

18  MANUFACTURING sold to CFE, a commission significantly higher than

19  the commission defendant LINDSEY MANUFACTURING had paid its

20  previous sales representative in Mexico, knowing that all or a

21  portion of that money would be used to pay Official 1 and others

22  at CFE bribes in exchange for CFE awarding defendant LINDSEY

23  MANUFACTURING contracts.

24              c.    Defendants LINDSEY MANUFACTURING, LINDSEY, LEE, and

25  ENRIQUE AGUILAR would cause the thirty percent commission to be

26  paid into Grupo's brokerage account at Global Financial, a

27  commission significantly higher than the commission defendant

28  LINDSEY MANUFACTURING paid to its previous sales representative

-7-

1  in Mexico, while knowing defendant ENRIQUE AGUILAR had a close

2  personal relationship with Official 1 and would use all or a

3  portion of the thirty percent commission to pay Official 1 and

4  others bribes in exchange for CFE awarding defendant LINDSEY

5  MANUFACTURING contracts.

6          d.    Defendants LINDSEY MANUFACTURING, LINDSEY, and LEE

7  would cause the cost of the goods and services defendant LINDSEY

8  MANUFACTURING sold to CFE to be increased by thirty percent to

9  ensure that the added cost of paying the thirty percent

10 commission was absorbed by CFE and not defendant LINDSEY

11 MANUFACTURING.

12         e.    When defendant LINDSEY MANUFACTURING was awarded

13 contracts by CFE, defendant ENRIQUE AGUILAR would cause invoices

14 from Grupo to be submitted to defendant LINDSEY MANUFACTURING

15 totaling approximately thirty percent of the money CFE paid to

16 defendant LINDSEY MANUFACTURING.

17         f.    In order to conceal the fact that defendant

18 LINDSEY MANUFACTURING was paying a thirty percent commission on

19 all of the money it received from CFE to Grupo, defendant ENRIQUE

20 AGUILAR would at times cause the invoices to falsely state that

21 half of the money being paid to Grupo (that is, fifteen percent

22 of the contract price) was a commission and that the remaining

23 fifteen percent was for other services purportedly rendered by

24 Grupo.

25         g.    Defendants LINDSEY MANUFACTURING, LINDSEY, and LEE

26 would cause the money requested in the fraudulent invoices to be

27 wired into Grupo's brokerage account at Global Financial, while

28 knowing that all or a portion of the money would be used to pay

-8-

1  bribes to Official 1 and others at CFE in exchange for the award
2  of CFE contracts.

3  C.    OVERT ACTS

4       4.    In furtherance of the conspiracy and to accomplish its
5  object, defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING,
6  LINDSEY and LEE, together with others known and unknown to the
7  Grand Jury, committed and willfully caused others to commit the
8  following overt acts, among others, in the Central District of
9  California, and elsewhere:

10                     *The Agreement*

11       Overt Act No. 1:    In or around 2002, defendants LINDSEY
12  and LEE entered into an agreement with defendant ENRIQUE AGUILAR
13  on behalf of defendant LINDSEY MANUFACTURING in which defendant
14  LINDSEY MANUFACTURING agreed to hire defendant ENRIQUE AGUILAR as
15  its sales representative in Mexico and to pay him a thirty
16  percent commission on all of the contracts that defendant LINDSEY
17  MANUFACTURING obtained from CFE.

18                  *The Fraudulent Invoices*

19       5.    On or about the following dates, defendant ENRIQUE
20  AGUILAR caused the following invoices to be submitted from Grupo
21  to defendant LINDSEY MANUFACTURING, fraudulently stating the
22  following amounts were owed by defendant LINDSEY MANUFACTURING to
23  Grupo for commissions and for services rendered by Grupo to
24  defendant LINDSEY MANUFACTURING:

| *Overt Act* | *Date* | *Inv.* | *Amount* |
|---|---|---|---|
| Overt Act No. 2: | Aug. 1, 2002 | 101 | $174,326.06 |
| Overt Act No. 3: | Aug. 2, 2002 | 102 | $174,326.06 |
| Overt Act No. 4: | Sept. 8, 2003 | 111 | $84,012.11 |

-9-

| | | | |
|---|---|---|---|
| Overt Act No. 5: | Oct. 2, 2003 | 112 | $86,111.00 |
| Overt Act No. 6: | Oct. 2, 2003 | 113 | $149,663.00 |
| Overt Act No. 7: | Oct. 21, 2003 | 114 | $149,663.00 |
| Overt Act No. 8: | Oct. 31, 2003 | 116 | $84,459.00 |
| Overt Act No. 9: | Nov. 28, 2003 | 117 | $44,162.00 |
| Overt Act No. 10: | Nov. 28, 2003 | 118 | $44,162.00 |
| Overt Act No. 11: | Dec. 19, 2003 | 119 | $112,079.42 |
| Overt Act No. 12: | Dec. 19, 2003 | 120 | $112,079.42 |
| Overt Act No. 13: | Dec. 19, 2003 | 121 | $54,251.10 |
| Overt Act No. 14: | Dec. 19, 2003 | 122 | $54,251.10 |
| Overt Act No. 15: | June 25, 2004 | 123 | $53,778.00 |
| Overt Act No. 16: | Dec. 21, 2004 | 126 | $134,061.00 |
| Overt Act No. 17: | Sept. 26, 2006 | 132 | $109,879.38 |
| Overt Act No. 18: | Sept. 28, 2006 | 133 | $42,104.40 |
| Overt Act No. 19: | Oct. 25, 2006 | 134 | $92,116.74 |
| Overt Act No. 20: | Nov. 10, 2006 | 135 | $1,567,416.00 |
| Overt Act No. 21: | Nov. 21, 2006 | 137 | $1,567,416.00 |
| Overt Act No. 22: | Jan. 10, 2007 | 139 | $121,642.00 |
| Overt Act No. 23: | Jan. 17, 2007 | 140 | $100,917.00 |
| Overt Act No. 24: | Jan. 17, 2007 | 141 | $80,242.00 |
| Overt Act No. 25: | Feb. 9, 2007 | 142 | $115,879.56 |
| Overt Act No. 26: | July 2, 2007 | 143 | $15,348.50 |
| Overt Act No. 27: | Sept. 13, 2007 | 144 | $260,468.00 |
| Overt Act No. 28: | Oct. 10, 2007 | 145 | $9,155.00 |
| Overt Act No. 29: | March 28, 2008 | 148 | $230,333.00 |
| Overt Act No. 30: | March 28, 2008 | 149 | $13,078.00 |

*The Bribe Payments*

6.   On or about the following dates, defendants LEE and

1   LINDSEY, on behalf of defendant LINDSEY MANUFACTURING, caused the

2   following wire transfers to be made from the accounts of

3   defendant LINDSEY MANUFACTURING to Grupo's Global Financial

4   brokerage account in the following approximate amounts, knowing

5   that all or a portion of the money would be used to pay bribes to

6   Official 1 and others at CFE in exchange for the award of CFE

7   contracts:

| Overt Act | Date | Amount |
|---|---|---|
| Overt Act No. 31: | Aug. 1, 2002 | $174,326.06 |
| Overt Act No. 32: | Aug. 5, 2002 | $174,326.06 |
| Overt Act No. 33: | Sept. 9, 2003 | $84,012.11 |
| Overt Act No. 34: | Oct. 3, 2003 | $235,744.00 |
| Overt Act No. 35: | Oct. 24, 2003 | $149,663.00 |
| Overt Act No. 36: | Nov. 10, 2003 | $84,459.00 |
| Overt Act No. 37: | Dec. 1, 2003 | $84,459.00 |
| Overt Act No. 38: | Dec. 8, 2003 | $44,162.00 |
| Overt Act No. 39: | Dec. 9, 2003 | $44,162.00 |
| Overt Act No. 40: | Dec. 24, 2003 | $112,079.42 |
| Overt Act No. 41: | Dec. 23, 2003 | $54,251.10 |
| Overt Act No. 42: | Dec. 30, 2003 | $166,600.52 |
| Overt Act No. 43: | July 15, 2004 | $53,778.00 |
| Overt Act No. 44: | Jan. 19, 2005 | $134,061.00 |
| Overt Act No. 45: | Oct. 2, 2006 | $109,879.38 |
| Overt Act No. 46: | Oct. 10, 2006 | $42,104.40 |
| Overt Act No. 47: | Nov. 1, 2006 | $92,116.74 |
| Overt Act No. 48: | Nov. 17, 2006 | $1,567,416.00 |
| Overt Act No. 49: | Nov. 28, 2006 | $1,567,416.00 |
| Overt Act No. 50: | Jan. 12, 2007 | $121,642.00 |

| | | | |
|---|---|---|---|
| Overt Act No. 51: | Jan. 18, 2007 | $100,917.00 |
| Overt Act No. 52: | Jan. 24, 2007 | $80,242.00 |
| Overt Act No. 53: | Feb. 14, 2007 | $115,879.56 |
| Overt Act No. 54: | July 5, 2007 | $15,348.50 |
| Overt Act No. 55: | Sept. 17, 2007 | $260,468.00 |
| Overt Act No. 56: | Oct. 12, 2007 | $9,155.00 |
| Overt Act No. 57: | April 10, 2008 | $230,333.00 |
| Overt Act No. 58: | April 22, 2008 | $27,000.00 |
| Overt Act No. 59: | May 23, 2008 | $13,078.00 |

### *The Benefits to the Foreign Officials*

Overt Act No. 60:   On or about July 13, 2006, defendant ENRIQUE AGUILAR and another individual known to the Grand Jury caused a letter to be submitted to Global Financial authorizing the transfers of funds from Grupo's Global Financial brokerage account to pay the credit card bills for Official 1's American Express credit card "in full every month, until further notice," which included the false explanation that Official 1 was the "brother-in-law of company owner."

Overt Act No. 61:   On or about August 23, 2006, defendant ENRIQUE AGUILAR aided Official 1 in purchasing an 82-foot yacht named the *Dream Seeker* for $1,800,010, which Official 1 later accepted as the true purchaser of the yacht.

Overt Act No. 62:   On or about August 24, 2006, defendant ENRIQUE AGUILAR caused a wire transfer to South Shore Yacht Sales Trust from Sorvill's Swiss bank account in the amount of approximately $360,000, as partial payment for the *Dream Seeker* yacht purchased for Official 1.

Overt Act No. 63:   On or about August 28, 2006, defendant

-12-

1   ENRIQUE AGUILAR and another individual known to the Grand Jury
2   caused the issuance of a check to South Shore Yacht Sales Trust
3   from Grupo's Global Financial brokerage account for approximately
4   $540,000, as partial payment for the *Dream Seeker* yacht purchased
5   for Official 1.

6       Overt Act No. 64:   On or about September 8, 2006, defendant
7   ENRIQUE AGUILAR caused a wire transfer to South Shore Yacht Sales
8   Trust from Sorvill's Swiss bank account in the amount of
9   approximately $450,000, as partial payment for the *Dream Seeker*
10  yacht purchased for Official 1.

11      Overt Act No. 65:   On or about November 30, 2006, defendant
12  ENRIQUE AGUILAR and another individual known to the Grand Jury
13  caused a wire transfer in the amount of approximately $250,000
14  from Grupo's Global Financial brokerage account to a Banco
15  Popular account ending xx370, which falsely stated that the wire
16  transfer was going to Official 2's female relative for "payment
17  for professional services advice."

18      Overt Act No. 66:   In or around November 2006, defendant
19  ENRIQUE AGUILAR caused a signed International Sales
20  Representative Agreement to be submitted to Global Financial,
21  which falsely stated that Official 2's female relative was a
22  sales representative for Grupo.

23      Overt Act No. 67:   On or about November 30, 2006, defendant
24  ENRIQUE AGUILAR and another individual known to the Grand Jury
25  caused a wire transfer in the amount of approximately $250,000 to
26  be sent from Grupo's Global Financial brokerage account to a
27  Banco Popular account ending xx581, which falsely stated that the
28  wire transfer was going to Official 2's male relative for

-13-

"payment for professional services advice."

    Overt Act No. 68:   In or around November 2006, defendant ENRIQUE AGUILAR caused a signed International Sales Representative Agreement to be submitted to Global Financial, which falsely stated that Official 2's male relative was a sales representative for Grupo.

    Overt Act No. 69:   On or about February 16, 2007, defendant ENRIQUE AGUILAR and another individual known to the Grand Jury caused the issuance of a check to Ferrari of Beverly Hills from Grupo's Global Financial brokerage account for approximately $297,500 to purchase a 2005 Ferrari Spyder (the "Ferrari") for Official 1.

    Overt Act No. 70:   In or around February 2007, defendant ENRIQUE AGUILAR and another individual known to the Grand Jury caused a statement of facts, which authorized Official 1 to pick up the Ferrari titled in defendant ENRIQUE AGUILAR's name, to be submitted to Ferrari of Beverly Hills.

    Overt Act No. 71:   In or around March 2007, defendant ENRIQUE AGUILAR caused a car insurance policy on the Ferrari to be issued under his own name but listed Official 1 as a driver of the Ferrari on the policy.

    Overt Act No. 72:   On or about March 9, 2007, defendant ENRIQUE AGUILAR caused a wire transfer in the amount of approximately $45,000 from Sorvill's Swiss bank account to a Banner Bank account number ending in xx227 to be applied to an escrow on behalf of Official 1's half brother CM.

    Overt Act No. 73:   On or about March 14, 2007, defendant ENRIQUE AGUILAR caused a wire transfer in the amount of

-14-

1  approximately $50,000 from Sorvill's Swiss bank account to a
2  Banco Popular account number ending in xx370, which stated that
3  the transfer was going to Official 2's mother as a "consulting
4  fee."
5      Overt Act No. 74:   On or about March 14, 2007, defendant
6  ENRIQUE AGUILAR caused a wire transfer in the amount of
7  approximately $50,000 from Sorvill's Swiss bank account to a
8  Banco Popular account number ending in xx581, which stated that
9  the transfer was going to Official 2's brother as a "consulting
10  fee."
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNTS TWO THROUGH SIX

[15 U.S.C. § 78dd-2(a); 18 U.S.C. § 2]

1.   The Grand Jury incorporates and realleges the allegations contained in paragraphs 1 through 12 in the Introductory Allegations above as though fully set forth in their entirety here.

2.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, and LEE, who were domestic concerns and officers, employees and agents of a domestic concern within the meaning of the FCPA, willfully made use of, and aided, abetted, and caused others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official, and to any person, while knowing that all or a portion of the money and thing of value would be and had been offered, given, and promised, directly and indirectly, to any foreign official for the purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist defendants ENRIQUE AGUILAR,

-16-

1   LINDSEY MANUFACTURING, LINDSEY, and LEE in obtaining and

2   retaining business for and with, and directing business to

3   defendant LINDSEY MANUFACTURING, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| TWO | 11/1/2006 | Wire transfer of approximately $92,116.74 from defendant LINDSEY MANUFACTURING's Preferred Bank account in California to Grupo's Global Financial brokerage account in Texas |
| THREE | 11/17/2006 | Wire transfer of approximately $1,567,416.00 from defendant LINDSEY MANUFACTURING's Preferred Bank account in California to Grupo's Global Financial brokerage account in Texas |
| FOUR | 11/28/2006 | Wire transfer of approximately $1,567,416.00 from defendant LINDSEY MANUFACTURING's Preferred Bank account in California to Grupo's Global Financial brokerage account in Texas |
| FIVE | 2/9/2007 | Wire transfer of approximately $115,879.56 from defendant LINDSEY MANUFACTURING'S Preferred Bank account in California to Grupo's Global Financial brokerage account in Texas |
| SIX | 9/17/2007 | Wire transfer of approximately $260,468 from defendant LINDSEY MANUFACTURING's California United Bank account in California to Grupo's Global Financial brokerage account in Texas |

-17-

COUNT SEVEN

[18 U.S.C. § 1956(h)]

1.     The Grand Jury incorporates and realleges the allegations contained in paragraphs 1 through 12 in the Introductory Allegations above as though fully set forth in their entirety here.

A.     THE OBJECTS OF THE CONSPIRACY

2.     From in or around 2002, through in or around March 2009, the exact dates being unknown to the Grand Jury, in Los Angeles County, in the Central District of California, and elsewhere, defendants ENRIQUE AGUILAR and ANGELA AGUILAR did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a.     knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b.     to knowingly transport, transmit, and transfer, and willfully cause others to transport, transmit, and transfer,

-18-

1  monetary instruments and funds from a place in the United States
2  to places outside the United States, intending that each of the
3  transactions, in whole and in part, promote the carrying on of a
4  specified unlawful activity, in violation of Title 18, United
5  States Code Section 1956(a)(2)(A); and
6          c.   to engage in a monetary transaction by, through,
7  and to a financial institution, in and affecting interstate and
8  international commerce, in criminally derived property that was
9  of a value greater than $10,000.00, that is, the deposit,
10 withdrawal, transfer and exchange of U.S. currency, funds, and
11 monetary instruments, such property having been derived from
12 specified unlawful activity, in violation of Title 18, United
13 States Code, Section 1957.
14 B.   THE MANNER AND MEANS OF THE CONSPIRACY
15      3.   The objects of the conspiracy were carried out, and to
16 be carried out, in substance, as follows:
17      4.   Defendant ENRIQUE AGUILAR and others known and unknown
18 to the Grand Jury would cause bribes to Official 1 and Official 2
19 to be paid into Grupo's brokerage account at Global Financial, in
20 violation of the Foreign Corrupt Practices Act, Title 15, United
21 States Code, Section 78dd-2, and in violation of the criminal
22 bribery laws of Mexico, namely, Article 222 of the Federal Penal
23 Code of the United Mexican States.
24      5.   Defendants ENRIQUE AGUILAR and ANGELA AGUILAR would
25 take a portion of the money paid to Grupo's brokerage account at
26 Global Financial and engage in monetary transactions designed to:
27 (1) conceal the source of the moneys and the fact that they were
28 bribes to Official 1 and Official 2; (2) promote the payment of

-19-

1   bribes through international monetary transactions for the

2   benefit of Official 1 and Official 2; and (3) engage in monetary

3   transactions of a value greater than $10,000 using criminally

4   derived property.

5   C.   OVERT ACTS

6        6.   In furtherance of the conspiracy and to accomplish its

7   objects, defendants ENRIQUE AGUILAR and ANGELA AGUILAR, together

8   with others known and unknown to the Grand Jury, committed and

9   willfully caused others to commit the following overt acts, among

10  others, in the Central District of California, and elsewhere:

11       Overt Act No. 1:   On or about July 13, 2006, defendant

12  ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused a letter to

13  be submitted to Global Financial authorizing the transfers of

14  funds from Grupo's Global Financial brokerage account to pay the

15  credit card bills for Official 1's American Express credit card

16  "in full every month, until further notice," which included the

17  false explanation that Official 1 was the "brother-in-law of

18  company owner."

19       Overt Act No. 2:   On or about August 23, 2006, defendant

20  ENRIQUE AGUILAR aided Official 1 in purchasing an 82-foot yacht

21  named the *Dream Seeker* for $1,800,010, which Official 1 later

22  accepted as the true purchaser of the yacht.

23       Overt Act No. 3:   On or about August 24, 2006, defendant

24  ENRIQUE AGUILAR caused a wire transfer to South Shore Yacht Sales

25  Trust from Sorvill's Swiss bank account in the amount of

26  approximately $360,000, as partial payment for the *Dream Seeker*

27  yacht purchased for Official 1.

28

1      Overt Act No. 4:   On or about August 28, 2006, defendant

2 ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused the issuance

3 of a check to South Shore Yacht Sales Trust from Grupo's Global

4 Financial brokerage account for approximately $540,000, as

5 partial payment for the *Dream Seeker* yacht purchased for Official

6 1.

7      Overt Act No. 5:   On or about September 8, 2006, defendant

8 ENRIQUE AGUILAR caused a wire transfer to South Shore Yacht Sales

9 Trust from Sorvill's Swiss bank account in the amount of

10 approximately $450,000, as partial payment for the *Dream Seeker*

11 yacht purchased for Official 1.

12      Overt Act No. 6:   On or about November 30, 2006, defendant

13 ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused a wire

14 transfer in the amount of approximately $250,000 to be sent from

15 Grupo's Global Financial brokerage account to a Banco Popular

16 account ending xx370, which falsely stated that the wire transfer

17 was going to Official 2's female relative for "payment for

18 professional services advice."

19      Overt Act No. 7:   In or around November 2006, defendant

20 ENRIQUE AGUILAR caused a signed International Sales

21 Representative Agreement to be submitted to Global Financial,

22 which falsely stated that Official 2's female relative was a

23 sales representative for Grupo.

24      Overt Act No. 8:   On or about November 30, 2006, defendant

25 ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused a wire

26 transfer in the amount of approximately $250,000 from Grupo's

27 Global Financial brokerage account to a Banco Popular account

28 ending xx581, which falsely stated that the wire transfer was

1  going to Official 2's male relative for "payment for professional
2  services advice."

3      Overt Act No. 9:    In or around November 2006, defendant
4  ENRIQUE AGUILAR caused a signed International Sales
5  Representative Agreement to be submitted to Global Financial,
6  which falsely stated that Official 2's male relative was a sales
7  representative for Grupo.

8      Overt Act No. 10:    On or about February 16, 2007, defendant
9  ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused the issuance
10  of a check to Ferrari of Beverly Hills from Groupo's Global
11  Financial brokerage account for approximately $297,500 to
12  purchase a 2005 Ferrari Spyder (the "Ferrari") for Official 1.

13      Overt Act No. 11:    In or around February 2007, defendant
14  ENRIQUE AGUILAR and defendant ANGELA AGUILAR caused a statement
15  of facts, which authorized Official 1 to pick up the Ferrari
16  titled in defendant ENRIQUE AGUILAR's name, to be submitted to
17  Ferrari of Beverly Hills.

18      Overt Act No. 12:    In or around March 2007, defendant
19  ENRIQUE AGUILAR caused a car insurance policy on the Ferrari to
20  be issued under his own name but listed Official 1 as a driver of
21  the Ferrari on the policy.

22      Overt Act No. 13:    On or about March 9, 2007, defendant
23  ENRIQUE AGUILAR caused a wire transfer in the amount of
24  approximately $45,000 from Sorvill's Swiss bank account to a
25  Banner Bank account number ending in xx227 to be applied to an
26  escrow on behalf of Official 1's half brother CM.

27      Overt Act No. 14:    On or about March 14, 2007, defendant
28  ENRIQUE AGUILAR caused a wire transfer in the amount of

-22-

1  approximately $50,000 from Sorvill's Swiss bank account to a
2  Banco Popular account number ending in xx370, which stated that
3  the transfer was going to Official 2's mother as a "consulting
4  fee."

5      Overt Act No. 15:   On or about March 14, 2007, defendant
6  ENRIQUE AGUILAR caused a wire transfer in the amount of
7  approximately $50,000 from Sorvill's Swiss bank account to a
8  Banco Popular account number ending in xx581, which stated that
9  the transfer was going to Official 2's brother as a "consulting
10 fee."

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT EIGHT

[18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2]

1.    The Grand Jury incorporates and realleges the allegations contained in paragraphs 1 through 12 in the Introductory Allegations above as though fully set forth in their entirety here.

2.    On or about the following date, in Los Angeles County, in the Central District of Los Angeles, and elsewhere, defendants ENRIQUE AGUILAR and ANGELA AGUILAR, together with and aided and abetted by others known and unknown to the Grand Jury, knowing that the property involved in the financial transaction described below represented the proceeds of some form of unlawful activity, conducted, and willfully caused others to conduct, the following financial transaction affecting interstate commerce, which transaction in fact involved the proceeds of specified unlawful activity, namely, a violation of the Foreign Corrupt Practices Act and a violation of the criminal bribery laws of Mexico, as set forth in Article 222 of the Federal Penal Code of the United Mexican States, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity:

| DATE | FINANCIAL TRANSACTION |
|------|----------------------|
| 2/16/07 | The deposit of a check issued from Grupo's Global Financial brokerage account ending XX964 for approximately $297,500 into a Pacific Western Bank account ending in XX200 for the purchase of a Ferrari in Beverly Hills in California. |

-24-

NOTICE OF FORFEITURE I

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 21 U.S.C. § 853]

1.    The Grand Jury incorporates and realleges all of the allegations contained in the Introductory Allegations and Counts One through Six above as though fully set forth in their entirety here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853.

2.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, or LEE, if convicted of any of the offenses charged in Counts One through Six of this Indictment, shall forfeit to the United States the following property:

      a.    All rights, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, including without limitation:

          1.    Bluffview Securities, LP account ending in account number xx558;

      b.    A sum of money equal to the total amount of proceeds derived from each such offense for which defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, or LEE is convicted, or for which defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, or LEE may be held jointly and severally liable.

-25-

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendants ENRIQUE AGUILAR, LINDSEY MANUFACTURING, LINDSEY, or LEE, if so convicted, shall forfeit substitute property, up to the total value of the property described in paragraph 2 above, if, by any act or omission of the defendant, the property described in paragraph 2, or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

NOTICE OF FORFEITURE II

[18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853]

1.   The Grand Jury incorporates and realleges all of the allegations contained in the Introductory Allegations and Counts Seven and Eight above as though fully set forth in their entirety here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982(a)(1) and Title 21, United States Code, Section 853.

2.   Pursuant to Title 18, United States Code, Section 982(a)(1), each of defendants ENRIQUE AGUILAR and ANGELA AGUILAR convicted under Count Seven and/or Count Eight of this Indictment shall forfeit to the United States the following property:

a.   All rights, title, and interest in any and all property involved in each offense committed in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, for which the defendant is convicted, and all property traceable to such property, including the following:

(1) all money or other property that was the subject of each transaction in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(I) and/or 1956(h);

(2) all commissions, fees, and other property constituting proceeds obtained as a result of those violations;

(3) all property used in any manner or part to commit or to facilitate the commission of those violations; and

(4) all property traceable to money or property described in this paragraph 2.a.(1) to 2.a.(3).

-27-

1          b.    A sum of money equal to the total amount of money

2  involved in each offense committed in violation of Title 18,

3  United States Code, Section 1956, or conspiracy to commit such

4  offense, for which the defendant is convicted.

5          3.    If, as a result of any act or omission by defendants

6  ENRIQUE AGUILAR and ANGELA AGUILAR, any of the foregoing money or

7  property (a) cannot be located upon the exercise of due

8  diligence; (b) has been transferred or sold to, or deposited

9  with, a third party; (c) has been placed beyond the jurisdiction

10 of the court; (d) has been substantially diminished in value; or

11 (e) has been commingled with other property that cannot be

12 subdivided without difficulty, then any other property or

13 interests of that defendant, up to the value of the money and

14 //

15 //

1  property described in the preceding paragraph of this Indictment,

2  shall be subject to forfeiture to the United States.

3

4                              A TRUE BILL

5

6                              ___/S/_____

7                              Foreperson

8

9  ANDRÉ BIROTTE JR.
   United States Attorney

10

11 ROBERT E. DUGDALE
   Assistant United States Attorney

12 Chief, Criminal Division

13 DOUGLAS M. MILLER
   Assistant United States Attorney

14 Public Corruption & Civil Rights Section

15

16 DENIS J. McINERNEY, Chief
   Fraud Section, Criminal Division

17 U.S. Department of Justice

18 NICOLA J. MRAZEK, Senior Trial Attorney
   Fraud Section, Criminal Division

19 U.S. Department of Justice

20

21

22

23

24

25

26

27

28

                            -29-