GIRARDI | KEESE
Stephen G. Larson (CA Bar No. 145225)
Molly B. Weber (CA Bar No. 271279)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Phone: 213-977-0211
Fax: 213-481-1554
E- Mail: slarson@girardikeese.com
E- Mail: mweber@girardikeese.com

Attorneys for Defendant
Angela Maria Gomez Aguilar

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>ENRIQUE FAUSTINO AGUILAR NORIEGA, ANGELA MARIA GOMEZ AGUILAR, LINDSEY MANUFACTURING COMPANY, KEITH E. LINDSEY, and STEVE K. LEE,<br><br>            Defendants. | CR No. 10-1031-AHM<br><br>**DEFENDANT ANGELA MARIA GOMEZ AGUILAR'S MOTION FOR A JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE GOVERNMENT'S EVIDENCE PURSUANT TO FED. R. CRIM. P. 29; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>***Filed Under Separate Cover***<br><br>**DECLARATION OF MOLLY B. WEBER IN SUPPORT; EXHIBITS** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendant ANGELA MARIA GOMEZ

AGUILAR hereby files this motion for an order, pursuant to the Court's authority under

Federal Rule of Criminal Procedure 29, entering a judgment of acquittal on both counts

with which she is charged because the evidence presented in the government's case-in-

chief is insufficient to sustain any such conviction.

Specifically, it is readily apparent that the evidence presented by the government is insufficient to convince any rational trier of fact to convict Angela Aguilar beyond a reasonable doubt on the two money laundering counts alleged against her in the First Superseding Indictment.

This motion is based on the attached memorandum of points and authorities and exhibits, and on such further argument and evidence as may be adduced at the hearing on this matter.

DATED: April 29, 2011        Respectfully submitted,


By:      _____/s/_____
         Stephen G. Larson
         GIRARDI | KEESE
         Attorneys for Defendant
         ANGELA MARIA GOMEZ AGUILAR

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES

3
4

### A. INTRODUCTION AND LEGAL STANDARD

5

Defendant Angela Aguilar moves this Court for an order entering a judgment of

6

acquittal pursuant to Federal Rule of Criminal Procedure 29.

7

Rule 29(a) provides, in pertinent part, as follows:  "After the government closes

8

its evidence or after the close of all the evidence, the court on the defendant's motion

9

must enter a judgment of acquittal of any offense for which the evidence is insufficient

10

to sustain a conviction."  See Burks v. U.S., 437 U.S. 1, 11 n. 5 (1978); 2A Fed. Prac. &

11

Proc. Crim. Sec. 462, fn 7 (4th ed. 2010) ("requirements mandatory").

12

The test for sufficiency of the evidence under Rule 29 is whether, viewing the

13

evidence in the light most favorable to the prosecution, any rational trier of fact could

14

find the essential elements of the offense beyond a reasonable doubt.  United States v.

15

Clayton, 108 F.3d 1114, 1116 (9th Cir. 1997), cert. denied, 522 U.S. 893 (1997); United

16

States v. Magallon-Jimenez, 219 F.3d 1109, 1112 (9th Cir. 2000).  In order to sustain a

17

conviction, there must be relevant evidence from which the jury could reasonably find

18

the defendant guilty beyond a reasonable doubt.  United States v. Price, 623 F.2d 587,

19

589-592 (9th Cir. 1980), overruled on other grounds, United States v. De Bright, 730

20

F.2d 1255 (9th Cir.1984); United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977);

United States v. Figueroa-Paz, 468 F.2d 1055, 1058 (9th Cir.1972).

21

A directed verdict for defendant, or judgment for acquittal as it is now called, is

22

an important safeguard to the defendant.  It tests the sufficiency of the evidence against

23

the defendant, and avoids the risk that a jury may capriciously find her guilty even

24

though there is no legally sufficient evidence of guilt.  This concern is particularly

25

heightened in a case, such as this, when the defendant is a foreign national with no

26

personal ties to the United States.  As Justice Stewart wrote for the Supreme Court in

27

Jackson v. Virginia, 443 U.S. 307 (1979):

28

1   The practice in the federal courts of entertaining properly
2   preserved challenges to evidentiary sufficiency [under
3   Rule 29] serves only to highlight the traditional
4   understanding in our system that the application of the
5   beyond-a-reasonable-doubt standard to the evidence is
6   not irretrievably committed to jury discretion.  To be sure,
7   the fact finder in a criminal case has traditionally been
8   permitted to enter an unassailable but unreasonable
9   verdict of "not guilty."  This is the logical corollary of
10  the rule that there can be no appeal from a judgment of
11  acquittal, even if the evidence of guilt is overwhelming. .
12  The power of the fact finder to err upon the side of mercy,
13  however, has never been thought to include a power to
14  enter an unreasonable verdict of guilty. … Any such
15  premise is wholly belied by the settled practice of testing
16  evidentiary sufficiency through a motion for judgment of
17  acquittal and a post-verdict appeal from the denial of
18  such a motion.

443 U.S. 307, 317 n. 10 (1979).

## B. THE GOVERNMENT HAS FAILED TO PROVE THE MONEY LAUNDERING COUNTS AGAINST ANGELA AGUILAR

To establish its *prima facie* case that Angela Aguilar participated in a money laundering scheme, either through a conspiracy with her husband, Enrique Aguilar, as alleged in count seven, or substantively, relating to the purchase of the Ferrari, as alleged in count eight, the government must present sufficient evidence, direct or circumstantial, from which a reasonable jury could infer, beyond a reasonable doubt,

1   that Angela Aguilar conducted financial transactions, or conspired to conduct or engage

2   in financial transactions, <u>knowing that the transactions involved criminally-derived</u>

3   <u>property</u>.  <u>See</u> 18 U.S.C. 1956 and 1957; <u>United States v. Turman</u>, 122 F.3d 1167, 1169

4   (9th Cir. 1997) (To convict defendant of money laundering, government must prove that

5   defendant "knowingly" engaged in financial transaction with proceeds of unlawful

6   activity, and that she knew transactions involved criminally derived property); <u>United</u>

7   <u>States v. Stein</u>, 37 F. 3d 1407, 1409 (9th Cir. 1994).

8          Although there are serious questions as to whether the government has provided a

9   sufficient basis to establish the other elements of the money laundering offenses or the

10  underlying specified unlawful activity (a violation of the Foreign Corrupt Practices Act

11  or Mexican bribery law), this much is clear:  The evidence presented by the government

12  does not suffice to permit a juror to reasonably infer that Angela Aguilar knew that the

13  money used in <u>any</u> of the transactions in which her name appears was derived from a

14  criminal source.  Even if her purported signature on the two checks and four wire

15  authorizations that form the basis of the charges against her provides a basis upon which

16  a reasonable juror might infer that she knowingly engaged in the six financial

17  transactions themselves, there is no evidence to reasonably infer that she knew that said

18  transactions involved criminally-derived property, and certainly not evidence to so find

19  beyond a reasonable doubt.

20         Viewing the evidence in the light most favorable to the prosecution, the

21  government has, at most, presented evidence from which a jury could arguably infer that

22  (1) a brokerage account was established in the name of Grupo International SA at

23  Global Financial Services ("Global"), and that Angela Aguilar, one of two signatories

24  on this account, was aware that a brokerage account had, in fact, been established; (2)

25  that the Grupo account accumulated substantial assets over time as a result of deposits

26  from Enrique Aguilar's Grupo-related business dealings as well as the investment

27

28  DEFENDANT MS. GOMEZ AGUILAR'S MOTION          3                                        13198342.2
    FOR AN ORDER ENTERING A JUDGMENT OF
    ACQUITTAL; FRCP 29

strategy employed by and directed by Enrique Aguilar and the account manager, Eduardo Bustani; (3) that Angela Aguilar was a beneficial owner of the Grupo account at Global, the bulk of which was made up of fixed income and equity investments and which was relatively stable until the financial crash in 2008, and it would be her money if Enrique Aguilar died, and would be their eldest daughter Angie's money if they both died; (4) that because Angela Aguilar and her daughter Angie were the beneficial owners of the Grupo account at Global, her signature was needed on checks and other financial documents in order for Enrique Aguilar to use that account, as he did, for his business and personal needs and to generate additional wealth; (5) Angela Aguilar was one of several family signatories on the Sorvill accounts at Dresdner in Germany and UBS in Switzerland (although, like her other family members who were signatories, she never once signed a check or other financial document related to this case); and (6) that, at Enrique Aguilar's direction (there is no evidence to suggest that she ever did so on her own initiative), Angela Aguilar signed numerous blank checks and other financial documents so as to give him access to the Grupo account at Global, an account into which, over time, he accumulated a significant amount of wealth for the ultimate benefit of her and her daughter.

As for Enrique Aguilar's business and business dealings, again giving the government every benefit of the evidence, circumstantial evidence arguably established that Angela Aguilar knew that her husband was a sales representative and that he represented companies that did business with, among others, CFE. The circumstantial evidence also established that, on account of their long-term social and family relationship, Angela Aguilar likely knew that her husband conducted business with Nestor Moreno, a high level employee at CFE. Further evidence established that Angela Aguilar knew that her husband purchased a Ferrari in Beverly Hills (there is no evidence that she actually saw either the car or the much-flaunted picture of the car; Ms.

1  Cerdan testified that she never saw the car in Mexico); that she signed a document

2  permitting Mr. Moreno, her husband's close, personal friend, to pick up that Ferrari

3  (assuming that she read the document in question, another proposition for which there is

4  no evidence); and that Mr. Moreno may (or may not) have picked up the Ferrari at the

5  Beverly Hills dealership (although there is a contemporaneous charge on Nestor

6  Moreno's American Express card for the Beverly Wilshire Hotel and a charge at the Las

7  Vegas Ferrari outlet soon thereafter, Sharon Berman of the Ferrari dealership testified

8  that there is no record of who picked up the car – perhaps Nestor Moreno, perhaps

9  Enrique Aguilar, perhaps both of them, perhaps neither of them).

10       In fairness, this evidence must be considered in the context of other

11  uncontroverted evidence about Angela Aguilar presented during the government's case-

12  in-chief.  During the government's case, the following was also established:  (1) Enrique

13  Aguilar was an "authoritative" and "controlling" husband, according to Connie Delgado

14  and Pattie Cerdan, who was, at the same time, "charming" and "charismatic," according

15  to Erica Abarca; (2) Angela Aguilar was an "intelligent" but very traditional "housewife,

16  mother, and wife," according to Ms. Cerdan, and she did not have anything to do with

17  her husband's business affairs ("Nothing!" as Ms. Cerdan emphatically testified) at

18  Grupo, Sorvill, Maquinaria Unida, or any other of his businesses; (3) Angela Aguilar

19  was not involved in the management of the Grupo account at Global with the exception

20  of attending perhaps 15 to 30 minutes of the annual 4-hour account review "meeting"

21  (which took place when she was on vacation with her family in Acapulco) and a few

22  other social lunches with her husband and Mr. Bustani, and there is no evidence of any

23  active connection to the Sorvill accounts, either in Germany (Dresdner) or later in

24  Switzerland (UBS); and (4) Angela Aguilar had no connection to Lindsey

25  Manufacturing Company, Steve Lee, or Keith Lindsey, or Enrique Aguilar's dealing

26  with that company and those individuals, as testified to by numerous current and former

27

28

employees of LMC (Connie Kwok, Jose Gabriel Zavaleta, Sergio Cortez, and Richard Serocki).

Given all this, no reasonable juror can reasonably infer that Angela Aguilar knew that the proceeds involved in the transactions in which she had a minor and tangential role (signing checks and various financial documents, some of which were blank and some of which were filled in by individuals never identified in the government's case-in-chief) constituted the proceeds of felonious criminal activity. That is an essential element that no juror could reasonably find established by any standard of proof, let alone proof beyond a reasonable doubt. In fact, if anything, the evidence presented in the government's case, on direct and cross-examination, establishes beyond a reasonable doubt that Angela Aguilar did <u>not</u> know that the proceeds involved in the various financial transactions were criminally derived.

The Court heard from several experienced industry executives who explained that being a sales representative is a common and legitimate job, sometimes served by an individual inside the company, and sometimes served by someone retained outside the company (independent sales representative). The only testimony providing some basis to suggest that a sales representative was anything but an honest broker came from those present and former employees of Lindsay Manufacturing Company who suggested that a 30% sales commission, the amount allegedly charged by Enrique Aguilar, was "high" relative to the sales commissions charged by others. Richard Serocki testified that, based on his lengthy experience in the business, the use of a sales representative or a "middleman" was a usual and common practice, and it was only strange if the commission was "huge."

No one, not one witness, testified that Angela Aguilar knew or had any reason to know how much of a commission her husband charged (not directly or circumstantially), or whether she had any awareness of what the standard or practice for such

commissions was in Enrique Aguilar's business.  Without knowing what the commission was, or how much the "normal" commission might be, no one can infer that she should have been or could have been suspicious of her husband's professional work. Again, all of the testimony on this point indicated that she had nothing to do with his business, and that such matters would never be discussed with her.  Moreover, there is no testimony or evidence from which the jury can infer that the alleged bribery activity created unusual wealth – the evidence at trial, particularly the testimony of Ms. Cerdan, all indicated that the Aguilars have long lived a modestly affluent lifestyle and have lived in a relatively affluent neighborhood.

Moreover, there is no evidence that Angela Aguilar knew anything about the source of the proceeds that were deposited into the Grupo account at Global – whether they came from Lindsay Manufacturing Company or anybody else.  Angela Aguilar may have, but likely did not, receive a monthly account summary that was only on one occasion, according to the extant Federal Express records, signed for at the Aguilar home by someone who identified him or herself as "A. Aguilar."  The account summary was described by Global compliance officer Bates as "confusing" and "complicated" (even the Court had to provide the jury with a glossary of terms to help them decipher its contents).  Perhaps most importantly, the account summary only identified wire transfer deposits by the name of the transferring bank or financial institution, not the source client or customer – thus, even with the account summary, there was no way it could have provided Angela Aguilar with any knowledge that the deposits into the Grupo account at Global came from Lindsay Manufacturing Company (let alone knowledge that Lindsay Manufacturing Company was forwarding a portion of proceeds that it had received from CFE).

As the Court well knows, the defense has maintained since the day of her arrest in Houston that there was no evidence connecting Angela Aguilar to any of the criminal

allegations in these charges.  Instead, the defense believes, moreso now than ever before, that what has unfolded in this case has been an ongoing effort by the government to detain and use Angela Aguilar, in haste and without sufficient evidence, to secure the surrender of their real target, Enrique Aguilar.  In denying the defense's motion to dismiss on this point, the Court made reference to the purchase of the Ferrari, which forms the basis of Count 8, and the inference that might be drawn from her involvement in its purchase on behalf of Nestor Moreno.  However, now having heard the government's case, the Court knows that there is no evidence that provides the jury a basis to infer that Angela Aguilar knew, prior to her arrest in Houston, where the proceeds used to purchase the Ferrari had been derived, let alone that they may have been derived from a criminal source.

Moreover, there is no evidence that she knew that the blank check she purportedly signed (and, according to the trial testimony of Sharon Berman, the representative of the Ferrari dealer, parts of which was filled out by as many as five different people) was going to be used by Enrique Aguilar to purchase the Ferrari. Although there are documents that may (or may not) have been read by Angela Aguilar that disclosed that Enrique Aguilar had purchased a Ferrari and that Nestor Moreno was authorized and insured to pick up the Ferrari, none of these documents provide evidence that Angela Aguilar knew that the car was being purchased for Nestor Moreno, that Nestor Moreno would ultimately take ownership of the car (if he did), or, more importantly, why it was being purchased for Nestor Moreno.  None of these documents, or any of the associated testimony, provide evidence that Angela Aguilar knew that the blank check she had signed was to be used to pay for a Ferrari, <u>let alone that the proceeds upon which that check was drawn were derived from or intended to promote any criminal activity.</u>

Finally, whatever happened to the Ferrari – who picked it up (the dealership has no record of who that was), who drove the Ferrari after it was picked up (no one testified to seeing Mr. Moreno or anyone else driving the Ferrari; his purchases at the Ferrari store in Las Vegas could just as much have been a gift for his good friend Enrique Aguilar as for himself), and who has it now (no records other than those that indicated the registered owner was Enrique Aguilar, not Nestor Moreno, were ever introduced) – is a mystery even to the government; for the jury to conclude, based on this record, that <u>Angela Aguilar</u> must have known, or even could have known, that it was purchased with the proceeds of money <u>intended for a bribe</u> or from any other illegal source would be utter speculation.  The only evidence that the Ferrari was ever mentioned in front of Angela Aguilar during the conspiracy came from Laura Garza, the poorly-trained notary, who testified that Enrique Aguilar said that <u>he </u>was purchasing the car; no mention was ever made of the car being purchased for Nestor Moreno.  The Ferrari makes for a passionate picture in the government's opening statement and summary charts, but there are massive missing links to make any criminal connection to Angela Aguilar.

As for the other alleged bribes to Nestor Moreno – the yacht purchase and the payments for the American Express card which, undisputedly, was established pursuant to Enrique Aguilar's direction – there is no evidence whatsoever establishing that Angela Aguilar had any knowledge of either.  There is no connection other than a blank check signed by Angela Aguilar which was ultimately used as partial payment for the yacht and, as the testimony of Global compliance officer Jane Bates made clear, the rationale for the Letter of Authorization for the Nestor Moreno American Express payments was filled in by another Global compliance officer, Steve Tenison, <u>after the letter was signed by Angela Aguilar</u> and at the direction of Enrique Aguilar (not, as Special Agent Susan Guernsey told the Grand Jury, at the direction of Angela Aguilar).

The government's improper and illogical conflation of Angela Aguilar's strictly limited knowledge about the Grupo account at Global with knowledge of the alleged criminal source or purpose of proceeds deposited into and withdrawn from that account by her husband Enrique Aguilar cannot form the basis for a reasonable conviction in this case. Everyone familiar with the Grupo account at Global – Eduardo Bustani, the account manager, his assistants, first Erica Abarca and then Laura Garza, and the compliance officer, Jane Bates – all testified uniformly and convincingly that Enrique Aguilar, and Enrique Aguilar alone, gave directions to Global and controlled the account. Although Angela Aguilar's signatures were on checks and financial documents, each of these individuals knew and admitted that, in reality, the client who managed and controlled the Grupo account was Enrique Aguilar.

All of the emails and other substantive correspondence between Global and their Grupo-related "client" concerning management of the account were authored by or directed to Enrique Aguilar, regardless of what email address was used. Eduardo Bustani met with Angela for short periods of time, on average, maybe once a year, to discuss the general performance of the account, but the daily and routine management of the account was conducted exclusively by and through Enrique Aguilar; Erica Abarca never spoke or met with Angela Aguilar; Laura Garza saw her once, when she (allegedly) notarized the Statement of Facts, but observed that she had nothing to say but a few pleasantries; Jane Bates, the compliance officer, saw her once, at a mediation where she said nothing, beyond pleasantries, and spoke to her once, on the phone when she simply confirmed that she was in the presence of her lawyers and that it was OK to give them the information about the account that they requested.

And, finally, the prison tapes. Taking just the excerpts selectively (and, in the defense view, unfairly) published by the government, they add little if anything to the government's evidence, individually or collectively. The October 28, 2010, excerpt

(Exhibit 852) has Angela Aguilar asking her husband how it went "with the HSBC thing" and discussing on which checking accounts they might both be signatories; the November 18, 2010 excerpt (Exhibit 853) has Angela Aguilar discussing a deposit by someone (which context clearly reveals to be her former attorney, Michael Zweiback) and then questioning, repeatedly, her husband about <u>his</u> statement that he sent Connie (Delgado) $3,000 "to pay the Ferrari thing"; the January 7, 2011, excerpt (Exhibit 854) has Angela Aguilar discussing the payment of various household bills as well as her own monthly American Express bill with her daughter, Erica; and the January 26, 2011, excerpt (Exhibit 855) has Angela Aguilar advising her daughter on the importance of "relationships" and "marketing" in her daughter's business.  The government did not provide an excerpt for the October 20, 2010, transcript, but, at best, it has Angela Aguilar advising Enrique Aguilar on what potential checking accounts and debit cards he might be able to use to pay something.

The Court heard the context in which all of the "prison calls" were made, which makes this series of seemingly irrelevant and unconnected calls even more innocuous. What anyone can reasonably infer from these snippets is entirely unclear.  Moreover, any "knowledge" inferred by these calls postdates Angela Aguilar's arrest, indictment, and the production of the government's discovery, so it provides no guidance as to her specific intent or knowledge for the relevant dates in the First Superseding Indictment. Finally, other portions of these calls which the government did not seek to highlight, not to mention the 165 calls subpoenaed but not used, powerfully and repeatedly reconfirm the nature of Angela and Enrique Aguilar's relationship as described above, as well as the very positive nature and character of Angela Aguilar.

The defense has never suggested, as the government appears to believe, that Angela Aguilar is stupid, or that she does not know how to conduct a financial transaction; to the contrary, she is an intelligent woman, traditional in her orientation to

the home and family responsibilities, and is quite capable of managing household affairs, including the family budget and various bank accounts.  What the defense has proven, through the government's case, is that she was not involved in the management or direction of the Grupo brokerage account at Global (or Sorvill), she did not have any involvement in any aspect of any of her husband's businesses, and, most dispositively, she did not have any knowledge of any criminally-derived proceeds.

## C.   THE GOVERNMENT MISLED THE GRAND JURY

In addition to failing to establish sufficient evidence to present a *prima facie* case, the trial testimony has also revealed that the government acted improperly in convincing the Grand Jury to return an indictment in the first place.  This misconduct, set forth below, provides an alternative basis to dismiss this case at this point.

As made clear from the trial testimony of co-case agent Susan Guernsey of the FBI, the government presented testimony to the Grand Jury both before the return of the original indictment and the First Superseding Indictment that was materially and admittedly false (or, to use Special Agent Guernsey's words, "the events were a little bit different").  What is now apparent is that the government never had any evidence to connect Angela Aguilar to the alleged money laundering scheme other than her signature on various financial documents; there never has been any evidence, direct or circumstantial, establishing her <u>knowledge</u> that the financial transactions in which she tangentially participated involved any <u>criminally-derived proceeds</u>.

To bolster their case before the Grand Jury, Special Agent Guernsey told the Grand Jury, without ever having a basis to do so, that her investigation had revealed that Angela Aguilar was affirmatively involved in providing a fraudulent rationale for a letter of authorization for Nestor Moreno's Global American Express account. Specifically, on September 8, 2010, the week before the return of the original indictment, Special Agent Guernsey testified under oath that, on the "standing" Letter of

Authorization authorizing payment of Nestor Moreno's American Express card, "she had to give an explanation as to why they were paying these American Express bills because he [Nestor Moreno] had no relation to the Grupo account." She then explained that "[Angela Aguilar's] reasoning is that he is the brother-in-law of the company owner, so she's saying that Nestor Moreno is the brother-in-law either of herself or Enrique Aguilar. Obviously she didn't specify on this who it was." (Grand Jury Transcript, September 8, 2010, at 38:16-18; 39:5-10) (*See Exhibit A*).

On September 15, 2010, the date of the return of the original indictment, the examining prosecutor and Special Agent Guernsey elaborate and explain the centrality of this evidence to the indictment:

> "Question: Now, you testified to this earlier, but I want to bring it out just to be clear. In this document there is handwriting above the signature of Angela Aguilar that states 'provide detail' – well, actually, the provision says, 'You must provide detailed explanation.' And then in handwriting it says, 'the brother-in-law of a company owner.' Now, during your testimony – well, let me ask you: The handwriting appears to have come from someone else; is that correct?
>
> "Answer: Yes, it appears different than other handwriting on the document, yes.
>
> "Question: And when I asked you earlier why you believe that the handwriting might have come from someone else, what was your testimony?
>
> "Answer: I believe I said that it was -- you know, through the course of the investigation it appears that it

was written at the direction of Angela Aguilar when they

asked for an explanation as to why they were paying the

American Express bill.

     "Question:  And that is in one of the pieces of

evidence that you relied on in deciding that Angela

Aguilar was a participant in this money laundering

scheme charged in Count Six and Seven of the

indictment; is that correct?

     "Answer:  Yes, that's correct."

(Grand Jury Transcript, September 15, 2010, at 4:7 – 5:7) (*See Exhibit B*).

Special Agent Guernsey testified at trial that she "corrected [her] testimony" before the return of the First Superseding Indictment after FBI agents interviewed the various employees at Grupo Financial Services <u>after</u> the original indictment was returned but before the return of the First Superseding Indictment (never mind how irresponsible it was to have made the representations without having done so in the first place).  Unfortunately, she made no such correction.  Although she did explain to the "new" Grand Jury that was convened for the First Superseding Indictment that it was Enrique Aguilar that provided the rationale for the Letter of Authorization to Eduardo Bustani at Global, neither she nor the prosecutor ever affirmatively corrected the record and informed the Grand Jury that Special Agent Guernsey's previous testimony, in which she stated that "through the course of the investigation it appears that it was written at the direction of Angela Aguilar," was in fact a false statement.

    To make matters worse, Special Agent Guernsey testified that this "new" Grand Jury was provided the transcripts from the previous Grand Jury, apparently without any admonition or advisement concerning the false information.  When asked whether she

DEFENDANT MS. GOMEZ AGUILAR'S MOTION    14
FOR AN ORDER ENTERING A JUDGMENT OF
ACQUITTAL; FRCP 29                            13198342.2

told this new Grand Jury that she had made a mistake in the earlier testimony, she testified that she "did not" because "[t]hey would not know what I was referring to"; however, she thereafter admitted that this new grand Jury was in provided the transcripts of her earlier Grand Jury testimony so that they could learn what the investigation was about, but, she protested, she did not "know if they read them."

Moreover, just before providing to the Grand Jury the explanation that Enrique Aguilar instructed Eduardo Bustani about the fraudulent rationale, she once again, without any basis in fact, linked Angela Aguilar to the fraudulent rationale for the Letter of Authorization in a most confusing fashion:

> "Question:  This authorization was a standing authorization; is that right?
>
> "Answer:  It was, yes.
>
> "Question:  This is like a one and done signature, and then it was applied or used repeatedly for multiple payments?
>
> "Answer:  Yes. The representative at Global said that that's what they did.  That they, you know, talked to Enrique and Angela, and they were told that they were going to be paying this account for that reason so they had them sign this document so that every time that the bill came in they could, they had to have – they had to have an authorization for every time they paid the bill. So they just continuously used this authorization over and over."

(Grand Jury Transcript, October 21, 2010, at 37:25 – 38:12) (*See Exhibit C*).

Remarkably, after confronting Special Agent Guernsey with these statements during cross examination by the undersigned, the government did not even address these false statements (the ones related to Angela Aguilar) in their re-direct examination.

Finally, as if the misrepresentations to the Grand Jury by the co-case agent were not bad enough, the prosecutor himself provided the Grand Jury, in his summary remarks, both before the return of the original indictment and the First Superseding Indictment, the false and prejudicial remark that Angela Aguilar presented her passport at the Ferrari dealership, the only act other than signing documents that would, if true, potentially implicate Angela Aguilar in the money laundering scheme. Said Mr. Miller to the Grand Jury: "Although Enrique Aguilar's name was put on the title of the Ferrari, Angela Aguilar presented a passport at the car dealership and signed a notarized document authorizing Nestor Moreno to pick up the Ferrari." (Grand Jury Transcript, September 15, 2010, at 47:1-5) (*See Exhibit D*). And then again before the First Superseding Indictment: "Although the handwriting on the check appeared to be different from her signature, we have introduced evidence showing that Angela Aguilar presented a passport at the car dealership and signed a notarized document authorizing Nestor Moreno to pick up the Ferrari." (Grand Jury Transcript, October 21, 2010, at 18:14-18) (*See Exhibit E*). As Special Agent Guernsey herself testified at trial (and is self-evident from the documents themselves), both documents – the passport and the notarized Statement of Facts – were faxed from Global in Houston to the Ferrari dealership in Beverly Hills, and Angela Aguilar was not present at the Ferrari dealership.

1

## D.  CONCLUSION

2      For the reasons set forth above, the undersigned respectfully requests this Court to

3 bring this ill-conceived, wrongly-pursued, and fundamentally unjust prosecution to an

4 end.

5 DATED: April 29, 2011          Respectfully submitted,

6

7

8                               By:     _____/s/_____

9                                       GIRARDI | KEESE
                                        Stephen G. Larson
10                                      Molly B. Weber
                                        Attorneys for Defendant
11                                      ANGELA MARIA GOMEZ AGUILAR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

*STATE OF CALIFORNIA, COUNTY OF LOS ANGELES*

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1126 Wilshire Boulevard, Los Angeles, California 90017-1904.

On **April 29, 2011**, I served the foregoing document described as **DEFENDANT ANGELA MARIA GOMEZ AGUILAR'S MOTION FOR A JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE GOVERNMENT'S EVIDENCE; MEMORANDUM OF POINTS AND AUTHORITIES** on all interested parties in this action as set forth on the attached service list in the following manner:

☐　**BY MAIL:**  I am familiar with this firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐　**BY FACSIMILE:**  In addition to service by mail as set forth above, a copy of said document(s) was also delivered by facsimile transmission to the addressee(s) pursuant to Code of Civil Procedure §1013(e).

☐　**BY OVERNIGHT MAIL:**  I caused said document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

☑　**BY PERSONAL SERVICE:**  By causing personal delivery by Molly Weber of the document(s) listed above to the person(s) on the attached service list.

☑　**(CM/ECF):**  I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send electronic notification of such filing to interested parties in this action.

☐　(STATE)　　I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☑　(FEDERAL)　I declare that I am employed in the office of the member of the bar of this court at whose direction the service was made.

Executed on **April 29, 2011** at Los Angeles, California.

Molly B. Weber

1

## PROOF OF SERVICE – SERVICE LIST

1

2 **Douglas M. Miller**
AUSA - Office of United States Attorney
3 **Jeffrey Goldberg**
4 US Department of Justice
**Nicola Jean Mrazek**
5 US Department of Justice
6 312 North Spring Street Street 12th Floor
Los Angeles, CA 90012-4700
7 213-894-2216
8 Fax: 213-894-0141
Email: USACAC.Criminal@usdoj.gov
9 Email: jeffrey.goldberg@usdoj.gov
10 Email: nicola.mrazek@usdoj.gov

11 *Attorneys for Plaintiff*

12
**Jan Lawrence Handzlik**
13 **Gracia Tse**
14 Greenberg Traurig LLP
2450 Colorado Avenue Suite 400E
15 Santa Monica, CA 90404
16 310-586-6542
Fax: 310-586-0542
17 Email: handzlikj@gtlaw.com
Email: tseg@gtlaw.com
18

19 **Matthew B. Hayes**
Hayes Employment Law Practice
20 225 South Lake Avenue Suite 300
21 Pasadena, CA 91101
626-344-8530
22 Fax: 626-921-4932
23 Email: mhayes@helpcounsel.com

24
*Attorneys for Defendants Keith E. Lindsey and Lindsey Manufacturing Company*
25

26 **Janet I. Levine**
**Martinique E. Busino**
27 Crowell & Moring LLP
515 South Flower Street 40th Floor
28 Los Angeles, CA 90071-2258
213-622-4750

2

Fax: 213-622-2690
Email: jlevine@crowell.com
Email: mbusino@crowell.com

*Attorneys for Defendant Steve K. Lee*